**ROSE ACRE FARMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 92–710C.**

United States Court of Federal Claims.

March 20, 2003.

Robert R. Clark, Indianapolis, Indiana, attorney of record for plaintiff and Thomas A. Barnard, Michael D. Chambers and William C. Wagner, co-counsel.

Sheryl L. Floyd, Department of Justice, Washington, D.C., and Kenneth Dintzer and Claudia Burke, co-counsel, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. David M. Cohen, Director, and James Holt, of Counsel, Department of Agriculture.

## OPINION

FUTEY, Judge.

This regulatory takings case is before the court following a trial on liability and damages. Plaintiff maintains that regulations enacted by the United States Department of Agriculture (USDA), which placed restrictions on chicken farms suspected of selling *salmonella*-infested eggs, caused a taking of plaintiff's healthy eggs, hens, and hen houses at three of its farms. Plaintiff argues the restrictions had a severe economic impact on its operations, interfered with its investment-backed expectations, and were not in the public's best interests. Plaintiff asserts a general regulatory takings claim for its healthy eggs and hen houses, and a categorical takings claim for its hens that were destroyed for testing purposes. Plaintiff seeks damages totaling over $40 million, which includes a request for compound interest.

Defendant contends plaintiff failed to establish at trial that the regulations resulted in a taking of its property. Defendant argues that the diversion of plaintiff's eggs, the periods its houses were unused while they were cleaned and inspected, and the destruction of a small amount of its hens for testing, caused plaintiff only minimal losses. Defendant also believes plaintiff had no investment-backed expectations because the poultry industry is heavily regulated. In addition, defendant asserts the regulations were a proper use of the government's police power and were in the public's best interest. With respect to damages, defendant maintains plaintiff's expert lacked credibility for numerous reasons, and therefore, plaintiff is unable to prove that it is entitled to any damage award.

### Factual Background

#### I. Plaintiff's Operations

Plaintiff, Rose Acre Farms, Inc., is a business incorporated under the laws of the State of Indiana with its principal place of business in Seymour, Indiana. Defendant, the United States of America, is acting by and through its agent, USDA. The Animal Plant Health and Inspection Service (APHIS), a division of USDA, administered the regulations at issue. APHIS is responsible for preventing the spread of communicable diseases in poultry, to protect the livestock and poultry of the United States.

Plaintiff is primarily a producer of poultry eggs for sale throughout the central Midwest

and Great Lakes regions. It sells mainly table eggs, which are raw eggs sold in their shell.[1] Plaintiff is one of the largest egg producers in the United States, with production facilities and farms in Indiana and Iowa. The three farms at issue in this case are located in Cortland, Indiana (Cort Acres), White County, Indiana (White Acres) and Jennings County, Indiana (Jen Acres).

Each of plaintiff's farms has numerous hen houses of varying capacity. Plaintiff treats these houses as separate units, and such things as feed, labor, and "started pullets"[2] are allocated carefully among houses and farms. A disruption of one facility can have repercussions across the entire operation.

Plaintiff's production methods are quite detailed. It is a vertically integrated system, meaning that virtually all of the functions required for egg production occur on plaintiff's premises. This includes everything from purchasing breeder chicks to the laying, processing, storage and shipment of eggs. Specifically, plaintiff buys breeder chicks when they are one-day old and raises them for an eighteen-week period. At eighteen weeks, plaintiff moves the breeder chicks to a breeder layer farm with accompanying roosters. At this farm, plaintiff produces fertile eggs for the purpose of hatching. Plaintiff then transports the fertile eggs to its own hatcheries. In a twenty-one-day period, the eggs hatch to make day-old chicks. Plaintiff then takes the day-old chicks to its pullet-raising facility where they are kept for eighteen weeks. At eighteen weeks, the pullets are sexually mature, meaning they are capable of laying eggs. Plaintiff then transports the pullets to layer farms, where they begin laying eggs. All of the laying hens in a particular house are approximately the same age. Layer hens peak in production at about twenty-eight weeks of age. After this time, their productivity declines on a regular basis until they reach the end of their productive life at seventy-five to seventy-eight weeks of age. During the productive cycle, they lay approximately 0.7 eggs per day. When the cycle has ended, the hens are removed and destroyed.[3] The house then receives a normal cleaning before new hens are introduced. Plaintiff is able to take advantage of associated economies of scale with this plan, and each farm can provide a consistent supply of table eggs for the appropriate regional market.

Since there are multiple steps involved in producing layer hens, plaintiff must plan for the placement of pullets in layer houses approximately eighteen months in advance. Indeed, much planning is involved in coordinating the timing of its depopulation and repopulation schedules for each house on its farms. Scheduling and timing, therefore, are key components of plaintiff's business. An interruption in plaintiff's scheduling system affects the entire organization, thus causing plaintiff to be unable to supply eggs to its customers.

Plaintiff's operations are also premised on an "in-line" facility. At an in-line farm, there is a grouping of layer houses for the purpose of producing eggs. The eggs laid in the houses are carried by a conveyor belt to the front of each house. A cross-conveyor belt then carries the eggs from a number of houses to a centrally located processing facility. At this facility, eggs are put through a series of machines; including a washer, dryer, candler, grader and packager; to clean, grade, sort and package the eggs for eventual sale.[4]

1. Table eggs are different from breaker eggs, which are sold in liquid form for use in products that require pasteurization, such as cake mixes. Table eggs command a higher price for sale than breaker eggs.

2. Started pullets are chicks who are older than one day. They are known as pullets until they sexually mature at approximately eighteen weeks.

3. The productive life of a layer hen can be extended by molting. This is a naturally occurring process that results from the reduction of light and feed to the bird. The hen's reproductive system rejuvenates during this process, thus allowing them to lay eggs until they are approximately 105 to 110 weeks of age. This process also improves both the interior and exterior quality of the eggs produced by the hens.

4. Plaintiff's eggs are packaged in two types of containers: thirty-egg flats and twelve-egg cartons. The flats generally are used for eggs sold to institutional-type settings, such as restaurants, hotels and banquet halls, and to outside breaking plants. Cartons generally are used for eggs des-

Each of plaintiff's layer farms includes a number of layer houses. For example, Cort Acres contains thirty-six separate houses. In 1990, all of plaintiff's layer houses were made of wood and had dirt floors with an outside shell of steel. These houses are two-story buildings, with the lower floor used to collect manure from the hens who are housed on the upper floor. Each layer house contains thousands of hens. For example, at Cort Acres each house contains approximately 70,000 hens. They are kept in rows of wired cages.

Plaintiff also operates feed mills at each of its layer farms, since feed for hens represents a very high percentage of plaintiff's total cost of producing eggs. Farmers deliver corn directly to plaintiff's farms, where it is stored in silos. Plaintiff mills the corn with soybeans and other ingredients to produce a nutritious meal for the hens. Feed is conveyed to the hens through a series of augers. Water is also mechanically delivered to the hens.

## II. The 1989 Traceback

In the late 1980's, the Centers for Disease Control (CDC) determined there was a growing problem with *Salmonella enteriditis* serotype *enteritidis* (SE) in chicken eggs.[5] Indeed, SE outbreaks originally were limited to the northeastern region of the United States. Between April 9 and April 11, 1989, however, an SE outbreak occurred in Knoxville, Tennessee. Federal and state officials performed a traceback to plaintiff's Jen Acre farm, which they believed to be the source of the SE. In May 1989, the Indiana State Poultry Association (ISPA) arranged with plaintiff's president, Lois Rust, to test Jen Acres for SE. Federal and state officials then performed environmental, blood and organ

testing. Said testing revealed SE on an egg belt in House 7 and in an intestinal sample from a hen in House 8. Plaintiff stored the eggs from these houses in its holding cooler for approximately two weeks after the testing revealed the presence of SE. On June 1, 1989, Houses 7 and 8 were retested-the samples of which came out negative.

After June 1, 1989, plaintiff received oral notification from ISPA that the houses, after subsequent testing, were SE-negative and were released from any restrictions or further testing. ISPA also informed plaintiff that it could do what it wished with the eggs from Houses 7 and 8. Plaintiff ultimately decided to sell the eggs as breaker eggs. On July 12, 1989, Houses 7 and 8 were retested. Again, the samples were negative.

## III. USDA's *Salmonella* Regulations

### A. *The interim regulations*

On February 16, 1990, in response to the increasing SE problem, APHIS, acting on behalf of the Secretary of Agriculture (Secretary), determined that emergency regulations were necessary to identify poultry flocks infected with SE and to prevent the spread of this disease. The Secretary therefore published interim regulations, effective immediately, that restricted the interstate sale of contaminated eggs and limited the interstate transportation of contaminated poultry. 9 C.F.R. §§ 82.30–82.36 (1991). USDA claimed that notice and public comment of the regulations could be waived because good cause existed, under 5 U.S.C. § 553 (1996), for immediate action to prevent harm to the industry and the general public. 55 Fed.Reg. 5580 (1990). The regulations were applied to "flocks" defined as "[a]ll of the poultry on one premises." 9 C.F.R.

---

tined for grocery stores. The difference in packaging cost between cartons and flats is two cents a dozen. Once eggs are placed in containers, they are further packed into cases. Each case holds thirty dozen eggs. Plaintiff's cartons and cases are imprinted with an expiration date and packing plant identification number. Before 1990, plaintiff packaged approximately two-thirds of its eggs in cartons and one-third in flats.

**5.** *Salmonella* is a gram negative rod-shaped microscopic bacterium that is ubiquitous. There

are more than 2,000 serotypes (strains) of *salmonella,* and it is most commonly found in the intestinal tract of animals and birds. Persons can be exposed to *salmonella* in many ways, but the most likely exposure is through the consumption of raw or undercooked foods of animal origin, such as meat, poultry, milk or eggs. When a person becomes sick from consuming *salmonella,* the condition is referred to as salmonellosis. Symptoms in humans include nausea, vomiting, abdominal cramps, diarrhea, fever and headache.

§ 82.30. The regulations did not define "premises," but USDA initially explained that the terms "flock" and "premises" meant the entire farm or egg-producing facility.

The interim regulations also required the USDA to identify an egg-production flock as a "study flock" if "a Federal or State representative determines through epidemiologic investigation that the flock is the probable source of disease in an outbreak of disease in humans or poultry caused by [SE]." 9 C.F.R. § 82.32(a). Shipping records or other evidence had to substantiate that the probable source of the eggs was the producer's flock. *Id.* If USDA designated a flock to be a study flock, it then had to perform environmental testing for SE pursuant to the regulations.[6] If one or more of the environmental samples tested positive for SE, or if the entity in control of the study flock refused environmental testing, the interim regulations mandated that the study flock be designated a "test flock." 9 C.F.R. § 82.32(b). The owner of a test flock could not freely market the test flock's eggs or the test flock itself. The regulations limited the test flock eggs to uses that required pasteurization, and allowed the interstate sale or shipment of the eggs only after the owner obtained a permit and satisfied certain requirements. 9 C.F.R. § 82.33(a). The test flock eggs could not be transported interstate for use as table eggs. Also, live hens could be moved interstate from a test flock if: (1) a permit had been obtained for interstate movement; (2) the chickens were moved interstate to a federally inspected slaughtering facility; and (3) the chickens were slaughtered within twenty-four hours of arriving at a federally inspected slaughtering facility. 55 Fed.Reg. 5584 (1990).

The regulations also required the test flocks to undergo blood and internal-organ testing. If the organs of one or more chickens from the test flock tested positive for SE, the flock was designated as an "infected flock." The regulations imposed the same restrictions on interstate movement for infected flocks that they did for test flocks and

their eggs. 9 C.F.R. §§ 82.32(c)(2), 82.33(a). Essentially, all hens, eggs, manure, cages, coops, containers, troughs and other equipment were quarantined and could not leave the house except "under seal." A flock kept its designation as an infected flock until defendant retested it and no internal organ received a positive result. Before USDA retested and released a test flock or infected flock from the applicable restrictions, the owner had to purchase special equipment and disinfection chemicals and implement specific disinfection procedures.

In March 1990, after the interim regulations went into effect, defendant established the SE Task Force in Hyattsville, Maryland. Thirty to forty people, mostly USDA veterinarians, were brought in from the field to work with SE and its effects.

### B. *The final regulations*

USDA published final SE regulations on January 30, 1991, 56 Fed.Reg. 3730 (1991) (codified at 9 C.F.R. § 82.30–82.38), following the receipt of comments from interested parties. These regulations incorporated most of the provisions of the interim regulations and added several additional provisions. For example, they used the term "house" to describe the components of the flock to prevent the transmission of SE to the other houses. The restrictions were therefore imposed on separate poultry houses when the specific requirements were met.

The final regulations also required retesting for additional reasons. If there was an infected house on the premises, for example, any other test house that had been released from test-house status because of two negative organ tests had to undergo a third blood and organ test within forty-five to sixty days following its release from test-house status. Also, if one house on the premises was infected, all other houses on the premises, except for test and former test houses, had to undergo environmental testing until 120 days after the date the last infected house had its

---

**6.** USDA believed, at the time, that any evidence of SE in the environment would indicate that the birds were infected, thus increasing the likelihood that they would lay SE-infected eggs. To the present date, the scientific community still does not fully understand all aspects of SE in eggs.

infected status removed. In addition, if an infected house was released from infected-house status, it had to be retested within forty-five to sixty days following its release. An infected house was released only after it was either depopulated, cleaned, washed, and disinfected, or internal organ samples tested negative. USDA inspected the premises to confirm that these procedures were properly performed. 9 C.F.R. §§ 82.32(e), 82.37.

USDA amended the final regulations in 1992 to alter the retesting procedures. 57 Fed.Reg. 776 (1992). These amendments allowed the flocks to be released from test or infected status if they were depopulated and their houses were cleaned, washed and disinfected. 57 Fed.Reg. 777. Also, the administrator of APHIS was given the authority to periodically retest a flock for eighteen months following its release from test or infected status, or after it was repopulated.

Pursuant to the regulations, APHIS administered USDA's SE traceback program until mid-1995. The traceback procedure involved investigating an outbreak of SE and determining the source of the eggs causing the incident. After an outbreak was reported, it took state and local health departments an average of two to three months to make official reports. By then it was difficult to carry out an effective egg trace. Indeed, the eggs containing the highest risk for humans usually had already been distributed and consumed.

As of 1996, there were approximately 1,000 large flocks with SE in the United States. Nevertheless, USDA restricted only thirty-eight flocks between 1990 and 1994. In total, over 1.3 billion eggs were diverted pursuant

to the regulations.[7] Restricted eggs from plaintiff represented more than one-half of this total.[8]

## IV. *Salmonella* Outbreaks Related To Plaintiff

### A. *Tracebacks*

Three separate outbreaks of SE contamination occurred in 1990 that were traced back to plaintiff's Cort Acres, White Acres and Jen Acres farms. The first incident happened on August 11, 1990, at a brunch wedding party in Versailles, Kentucky. Forty-two guests became ill when they ate eggs benedict with hollandaise sauce. The Kentucky Department for Health Services, in conjunction with APHIS, traced the source to eggs from plaintiff's Cort Acres facility.[9] USDA then declared all thirty-six houses at Cort Acres to be a study flock. USDA took environmental samples from the manure and egg conveyor belts at Cort Acres, and also obtained eighteen samples from each of the houses. Some of the houses tested positive in at least one environmental sample. Based on these results, USDA declared plaintiff's entire farm at Cort Acres to be a test flock. Plaintiff's interstate movement of the eggs from that facility was therefore restricted, and its sale of the eggs was limited to the pasteurization market. USDA eventually applied the restrictions to only the specific houses at Cort Acres that tested positive. In response to USDA's testing, the Indiana State Board of Health notified plaintiff that it could no longer distribute, transport, or move the chickens, eggs and associated articles in intrastate commerce, except for pasteurization.[10]

7. Defendant's witness, Dr. John Mason, testified that of the 1.3 billion diverted eggs, approximately 0.3 percent were SE positive. Trial Transcript (Tr.) at 802.

8. The court notes that in November 1991, defendant formed a subcommittee of the SE Working Group to organize the SE Pilot Project in Pennsylvania. The Pennsylvania Pilot Project was established in Lancaster, Pennsylvania in April 1992. Its stated objectives were to develop effective and efficient monitoring for SE infection in layer flocks, with the ultimate goal of preventing SE from contaminating eggs. The Project investigated the prevalence of SE in eggs by testing their internal contents. It determined that in

10,000 eggs taken from an environmentally SE-positive house, only 2.75 would contain SE.

9. In 1990, Cort Acres had thirty-six houses, which were configured into four quartiles with nine houses per quartile. Each house contained approximately 70,000 hens. Cort Acres' farm-wide capacity was 2.4 million hens.

10. Cort Acres was suspected to be the source of an additional outbreak in Asheville, North Carolina on September 22, 1990. Since Cort Acres was already subject to investigation and restrictions, defendant did not notify plaintiff of this incident.

A second SE outbreak occurred on September 30, 1990, at the Hyatt Regency hotel in Chicago, Illinois, where approximately 400 people became ill from SE-infected bread pudding at a True Value Hardware convention. The Chicago Health Department and the Illinois Department of Public Health jointly issued a report that traced the outbreak to eggs produced at plaintiff's White Acres farm.[11] USDA declared half of the twelve houses at White Acres to be a study flock based on this report. It then conducted environmental testing on the six houses, which came back positive. On November 27, 1990, USDA designated these six houses as a test flock, thus restricting the interstate movement of their eggs and limiting their use to pasteurization. USDA later conducted environmental testing at the remaining six houses. Some of these houses tested positive, so USDA identified the entire flock as an infected flock and imposed the applicable restrictions. On January 15, 1991, the Indiana State Egg Board imposed restrictions on plaintiff's intrastate sales of the White Acres eggs, determining that they could only be sold for pasteurization.

A third SE outbreak occurred on October 25, 1990, in Tennessee where seven people became ill when they consumed banana pudding with meringue. The Tennessee health authority determined that the suspect eggs originated from plaintiff's Jen Acres facility.[12] USDA conducted environmental testing, which came back positive. It then restricted all of the Jen Acres flocks in January 1991, thus preventing the interstate movement of its eggs and limiting their sale to pasteurization markets. On February 6, 1991, USDA declared Jen Acres an infected flock. All of the houses at Jen Acres were subject to the restrictions. On January 17, 1991, the Indiana State Egg Board notified plaintiff that it was imposing restrictions on the intrastate movement of eggs from Jen Acres. Plaintiff was now only permitted to sell them in intrastate commerce for pasteurization.

### B. *Plaintiff's response to the outbreaks*

In addition, after houses were labeled test flocks at the three farms, hens at these facilities were tested for the presence of SE. USDA physically removed them from the houses, killed them, and then transported the carcasses to a USDA laboratory in Ames, Iowa. Once USDA labeled a house "infected," one option for getting the house released was to re-test hens and have them pass two consecutive organ tests. Plaintiff tried this option, but in most cases was unsuccessful. A total of 6,741 hens were removed from plaintiff's houses for necropsy, a procedure similar to an autopsy that tested for SE. Only 147 of them (approximately 2.18%) tested positive.

Moreover, plaintiff had to depopulate, clean, disinfect and get reinspected by USDA at all layer houses in order to be released from the restrictions. USDA required wet cleaning for each house, which was more expensive and time consuming than the traditional dry cleaning method. The wet cleaning damaged the electrical wiring in most of plaintiff's houses, and in fact was related to a fire that partially burned down the inside of one of the houses. USDA's inspection after the wet cleaning was limited to a visual examination with a flashlight. It did not retest the environment or the hens. Sometimes the houses were empty for long periods of time as they awaited USDA inspection.

On May 8, 1992, USDA notified plaintiff that all remaining White Acres houses had been released from the SE restrictions. The Cort Acres facility was removed from the quarantine on July 16, 1992. Jen Acres received its reprieve on October 30, 1992. Thus, defendant applied the SE regulations to plaintiff for over twenty-one months. During the entire restriction period, defendant never tested any of plaintiff's eggs.

### V. Effect Of The Restrictions On Plaintiff's Operations

Prior to the enactment of the regulations, over 97% of the eggs plaintiff produced were

---

11. In 1990, White Acres had twelve houses, each of which contained approximately 125,000 hens. White Acres' farm-wide capacity was 1.5 million hens.

12. In 1990, Jen Acres had twenty-two houses, twenty-one of which were in production. Each house had capacities ranging from 67,320 to 112,000 hens. Jen Acres' farm-wide capacity was 1.5 million hens.

sold as table eggs, and plaintiff had invested approximately $82.2 million in its table egg business. During the restricted period, plaintiff's primary business purpose continued to be the production of table eggs, although plaintiff was forced to divert millions of eggs to breaker plants.[13] After the quarantine ended in mid–1992, plaintiff immediately returned to selling over 97% of its eggs as table eggs. In addition, before and during the SE quarantine period, plaintiff primarily sold eggs in interstate commerce. Indeed, 90% of its eggs were sold in interstate commerce leaving 10% for sale in intrastate commerce.

Also, in response to the SE quarantine, plaintiff decided to build a breaker plant at Cort Acres in January 1991. Construction of said plant was completed in May 1991. The total cost of this project was approximately $6 million. Plaintiff built the facility to minimize its losses, when it was restricted to selling its eggs for pasteurization. Plaintiff also expanded its Pulaski County breaker plant to accommodate restricted eggs from White Acres.

In total, plaintiff diverted over 57.5 million dozens (nearly 700 million eggs) to breaker plants during the restricted period. Plaintiff sold 24,006,780 dozen restricted eggs to outside breaker plants. It also processed 33,753,843 dozen eggs in its own breaking plants, and sold the resulting liquid product to liquid-egg producers. The price plaintiff received for the breaker eggs was always less than what it would have made if it were selling table eggs. Indeed, the average cost for plaintiff to produce a dozen eggs during the period of restriction was 54.96 cents. Plaintiff received, however, only 41.46 cents per dozen for eggs sold to outside breaking plants, and 46.64 cents per dozen for eggs processed in plaintiff's own breaking facilities. The average price of table eggs during the restrictions was 59 cents per dozen.

Furthermore, plaintiff had to purchase table eggs from its competitors to cover some of its contractual obligations to its customers. Plaintiff also had to store some of its eggs in a commercial facility until it could identify a liquid egg market to absorb them.

Moreover, started pullets that plaintiff had slated for unrestricted houses had to be used to repopulate the restricted houses. Also, pullets in the unrestricted houses had to be molted or left in production beyond normal production cycles, resulting in a decline in production in unrestricted houses. This upset the scheduling and timing of plaintiff's routine operations.

## VI. Plaintiff's Challenges To The Regulations

Plaintiff disagreed with the restrictions defendant imposed on its farms, and thus, decided to challenge the SE regulations. On December 28, 1990, plaintiff filed a complaint in the United States District Court for the Southern District of Indiana (District Court) seeking declaratory relief stating that the interim regulations were invalid. Plaintiff amended its complaint on February 18, 1991, to seek declaratory relief finding the interim and final regulations invalid because: (1) they both deprived plaintiff of due process; (2) the interim regulations were not promulgated in accordance with the Administrative Procedure Act; (3) both sets of regulations exceeded the USDA's statutory authority; (4) the final regulation could not be applied retroactively; and (5) both sets of regulations unlawfully delegated authority to state officials.[14] Plaintiff later amended its complaint again to include claims that: (1) the application of certain monitoring provisions was invalid and (2) it was entitled to compensation for eggs diverted to pasteurization facilities,

---

13. A breaker plant separates an egg's liquid contents from its shell. The plant then pasteurizes (or heats) the contents to kill any bacteria within the egg. A USDA official must be present while the plant is in use. Before the restriction period, plaintiff only sent eggs of inferior quality to breaker plants. Less than three percent of its eggs met this criteria. Also, prior to the restriction period, plaintiff had one small breaker plant at its Pulaski County farm in northern Indiana. Most of plaintiff's breaker eggs, however, were sent to out-of-state breaker plants not owned by plaintiff.

14. Defendant's Motion In Limine (Def.'s Mot.), Appendix (App.) at 13–17 (District Court Complaint).

hard boiling, or export.[15] The District Court ruled against plaintiff, finding that: (1) defendant had the authority to promulgate the interim and final regulations; (2) the application of the regulations did not deprive plaintiff of due process; and (3) the regulations were not arbitrary or capricious.[16] The District Court, however, did find the monitoring provision to be arbitrary and capricious, and concluded that the SE regulations, as a whole, were invalid because they explicitly contemplated no mechanism for compensating restricted eggs or for chickens executed for testing purposes.

Both parties appealed to the United States Court of Appeals for the Seventh Circuit (Seventh Circuit), who reversed the District Court's order invalidating the SE regulations. *Rose Acre Farms, Inc. v. Madigan,* 956 F.2d 670, 672–74 (7th Cir.1992). The Seventh Circuit held that plaintiff must instead seek compensation under the Fifth Amendment or 21 U.S.C. §§ 114a and 134a (1999) in the United States Court of Federal Claims. The Seventh Circuit also determined that the regulations were made within the authority of the Secretary and that they were neither arbitrary nor capricious. *Id.* at 675–677.

Plaintiff then filed a complaint in this court on October 13, 1992, requesting the following: (1) an amount equal to the value of the birds and eggs taken as a result of the restrictions; (2) the cost of compliance with the SE regulations; and (3) losses from a decrease in egg production. Plaintiff's claims are premised on the Fifth Amendment and 21 U.S.C. §§ 114a and 134a. Plaintiff seeks $21,589,015.38 [17] in damages, excluding interest. This amount includes compensation for: (1) restricted egg sales; (2) losses from layers taken for necropsy; (3) empty house losses from depopulation through inspection; (4) reduced production during restricted periods before required depopulation; (5) reduced production during unrestricted periods before required depopulation; (6) cleaning and disinfection costs; (7) purchase of table eggs to cover obligations; (8) storage costs for restricted eggs; (9) losses due to disruption of overall business; and (10) interest.

Defendant filed a motion to dismiss on January 3, 1995, arguing that plaintiff had failed to state a claim upon which relief may be granted and that the court lacked jurisdiction to hear plaintiff's claim based on sections 114a and 134a. The court dismissed plaintiff's claim under section 114a, but denied the remainder of defendant's motion in an unpublished decision issued August 7, 1995. The parties then engaged in extensive discovery. Following the pre-trial conference conducted on October 10, 2001, defendant filed a motion in limine arguing that plaintiff was precluded from challenging the regulations. The motion also contested plaintiff's request for consequential damages. On March 19, 2002, the court denied this motion without prejudice, choosing instead to address it in the court's post-trial opinion. Indeed, these arguments are considered below. A trial was held in Washington, D.C. on April 30—May 10, 2002. Post-trial briefing was completed on July 1, 2002.

*Discussion*

Plaintiff asserts the taking of three items during the period of restriction, its healthy eggs, hen houses and hens. Plaintiff raises a general regulatory takings claim for its eggs and houses, and a categorical taking of its hens. It also cites relief under 21 U.S.C. § 134a, although it does not specify any particular claims pursuant to this statute. Plaintiff seeks just compensation for these items and various related costs. Defendant maintains that plaintiff is unable to establish the elements of a regulatory and categorical takings claim, thus precluding any just compensation. Defendant also adds that many of plaintiff's theories are attempts to recover

---

**15.** *Id.,* App. at 19–21, 26 (Amendment to District Court Complaint).

**16.** *Id.,* App. at 61 (Judgment of District Court).

**17.** Plaintiff has amended the amount of its damages request numerous times. This figure represents the costs plaintiff set forth at trial and in its post-trial briefing. In addition, plaintiff actually requests a total of $21,589,015.85. The court's calculation of plaintiff's listed expenses, however, results in a total of 38 cents, not 85 cents.

consequential damages, which takings law does not allow.

## I. Preliminary Issues

Before addressing the specifics of the parties' takings arguments, it is important to comment on two underlying issues: (1) plaintiff's actions in the "but-for" world, and (2) the methodology implemented by the regulations. The effectiveness of safe-handling instructions is also a key point. The court's findings on these issues are necessary to fully analyze the elements of regulatory takings.

### A. The "but-for" world

A "but-for" world is a hypothetical scenario predicting what would have happened if some outcome determinative factor had not occurred. In the present case, the parties dispute the nature of plaintiff's reaction to the SE tracebacks if defendant had never enacted the regulations. Defendant maintains that plaintiff would have acted the same in this but-for world. It asserts that plaintiff would have used the same house cleaning procedures and diversion method for its eggs. Defendant also argues that adverse publicity and the threat of private lawsuits would have persuaded plaintiff to follow these procedures. Defendant emphasizes plaintiff's response to the 1989 traceback to support its claim.

Plaintiff contends defendant's but-for world is flawed because plaintiff did not voluntarily test and restrict its eggs during the 1989 traceback. Plaintiff also claims that adverse publicity and products liability lawsuits would not have affected its reaction to the SE tracebacks. Plaintiff adds that the purpose of the regulations was to change behavior. It questions the point of having the regulations if its response would have been the same.

After careful consideration of the parties' evidence, the court concludes that plaintiff's response to the outbreaks would have dif-

fered if there were no regulations. Plaintiff presented persuasive evidence at trial that it would not have undergone the same cleaning and disinfecting procedures for its houses if there were no regulations. The costs of these procedures were quite expensive, and the regulations required plaintiff to "wet clean," which is costly and destructive. Indeed, this procedure damaged the electrical wiring in the houses, thus requiring new wires to be installed. As Victor Rigterink, plaintiff's executive vice president, testified, "Imposition of water into a house which is wood certainly doesn't do any good. It also ruined the electrical system in almost every house. We had to rewire almost all of the houses after it was wet-cleaned. In fact, one of them partially burnt down on the inside." [18] Plaintiff never used wet cleaning before the government ordered the procedure per the regulations.

Plaintiff also made clear that it would not have diverted its eggs to the breaker market after the 1989 traceback if the government had not required such an action. Plaintiff offered testimony at trial that defendant threatened to "mess with its markets" if it did not follow procedures and divert its eggs in 1989.[19] Plaintiff's employees emphasized that there was nothing voluntary about restricting their eggs. For example, plaintiff's president, Lois Rust, stated "I felt that we were forced into agreeing to this .... He said that either do it or else." [20] Mr. Rigterink added "we felt seriously coerced to do so." [21] In fact, defendant's witness, Dr. Paul Aho, who claimed that plaintiff voluntarily diverted its eggs during the 1989 traceback, admitted that he had no personal knowledge of any egg producer who diverted eggs voluntarily as the result of a traceback.[22] Defendant's argument that plaintiff would have voluntarily diverted its eggs after the three subsequent tracebacks, regardless of whether there were regulations in place, is unpersuasive.

18. Tr. at 200.

19. *Id.* at 975.

20. *Id.* at 75–76.

21. *Id.* at 261.

22. *Id.* at 1366.

Moreover, plaintiff proffered evidence that the adverse publicity to the tracebacks was irrelevant in terms of its conduct. After the 1989 traceback, plaintiff briefly changed its name on its cartons to a different house brand to avoid any stigma attached to the title "Rose Acre."[23] This change only lasted for a few weeks, however, because plaintiff received multiple phone calls from wholesalers asking that it return to the Rose Acre brand.[24] The familiarity of the Rose Acre name was very important to plaintiff's customers.

Also, the threat of private lawsuits is not convincing evidence that plaintiff would have diverted its eggs and implemented wet cleaning if there were no regulations in place. Indeed, plaintiff still encountered litigation when it was subject to the regulation-imposed restrictions. Plaintiff simply turned these claims over to its insurance carrier, and had little involvement with them.[25] It presumably would have reacted the same way in the but-for world. There is no reason to believe that the threat of lawsuits would have persuaded plaintiff to apply different cleaning procedures, or divert its eggs to the breaker market.

### B. *Comments on the regulations*

The Seventh Circuit has already determined the constitutionality of the regulations, nevertheless, the issue still remains on whether they caused a taking of plaintiff's property. USDA believed at the time of the tracebacks that if the hens' environment contained SE, they too carried the disease.[26] It therefore concluded that the hens would lay eggs that were infected.[27] The regulations' requirements were based predominantly on this belief. Indeed, when SE was traced back to a particular house, defendant ordered testing of its hens and environment. Defen-

dant never sought to have the eggs tested, despite the fact that they were the alleged sources of the SE outbreaks. If either the hens or the environment tested positive for SE, the regulations imposed a strict ban on table egg sales in interstate commerce. Plaintiff then had the option of retesting the hens on two subsequent occasions or depopulating, cleaning, disinfecting and then repopulating the houses. Plaintiff generally chose the latter, and spent much time wet cleaning and disinfecting the houses and repopulating with new hens. After plaintiff completed the cleaning, defendant never retested the environment or hens. Its inspection consisted of a simple walk through of the houses with a flashlight. Again, the eggs themselves were never tested.

The court believes that such requirements were misguided, at best. The parties made clear at trial that SE exists everywhere in our world, and it is impossible to eradicate.[28] The fact that SE was found in plaintiff's houses, therefore, does not indicate that the eggs were infected too. Also, the fact that SE was found in the hens does not necessarily implicate their eggs as well. The phenomenon of intermittent shedding proves that the hens' eggs could very well be SE-free.[29] Regardless, testing of plaintiff's hens resulted in a very low prevalence of SE-positives.

Moreover, defendant was aware in the late 1980's that SE could exist inside an egg. In addition, the scientific technology for testing the inside of eggs existed at the time the regulations were enacted. Such testing was used in the United Kingdom and during defendant's Pennsylvania Pilot Project.[30] The Project discovered that 99.9725% of eggs were SE-free. It was possible, therefore, for defendant to test plaintiff's eggs for the bacterium. The court considers defendant's decision to test the hens and the environment,

---

23. *Id.* at 252.

24. *Id.* at 251–52.

25. *Id.* at 251.

26. *Id.* at 704–05.

27. *Id.*

28. *Id.* at 993; Joint Exhibit (Jt.Ex.) 3.

29. "Intermittent shedding" is a theory explaining how an egg formed in the reproductive tract of a hen may or may not acquire an SE bacterium while it is developing. Tr. at 483. Indeed, a hen with SE may never lay an infected egg. Tr. at 484.

30. Tr. at 758–60, 1077.

and then to follow up said tests with a simple walk-through of the houses with a flashlight, to be a careless method of preventing the further exposure of SE to consumers.

### C. Safe-handling instructions

The safe handling of an SE-infected egg eliminates the bacterium before consumption. Safe handling involves such things as thoroughly cooking an egg before consumption. Instructions on the egg cartons explained this fact to users of the product. As plaintiff emphasized during trial, there are many possible sources of the SE outbreaks traced back to plaintiff's farms. A restaurant worker's improper handling of the eggs while preparing an egg-based food is a perfect example. As defendant's witness, Dr. John Mason, admitted at trial, emphasizing safe handling of the eggs would have been a very effective way to deal with the SE outbreaks.[31] Considered in light of the fact that defendant never tested plaintiff's *eggs*, the court does not believe defendant has established that plaintiff had an SE problem. Indeed, millions of plaintiffs eggs were safely consumed during the period between the three SE outbreaks and the time plaintiff's operations were restricted. For example, approximately 90 million eggs were sold from Cort Acres during this time.[32] Despite this fact, the regulations restricted millions of plaintiff's *healthy eggs* by prohibiting their sale in the table egg market.[33] The court will consider all of these observations throughout its analysis of plaintiff's claim.

### II. Takings Analysis

Plaintiff is asserting a regulatory taking and a categorical taking of its property. The main difference between the two is the amount of the economical viable use of the property that has allegedly been appropriated. This distinction results in the application of different analyses. *Compare Penn Central Transp. Co. v. City of New York*, 438

U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (applying a three-part regulatory takings test), *with Palm Beach Isles Assoc. v. United States*, 231 F.3d 1354, 1357 (Fed.Cir. 2000) (explaining that it is unnecessary to consider whether there was an investment-backed expectation).

### A. Regulatory taking

▮▮▮ A regulatory taking does not involve a physical invasion or seizure of property. Instead, it concerns action that affects an owner's use of property, and is based on the general rule "that 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed.Cir.1995) (quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). The government need not make use of, or take title in, the property at issue for a taking to occur because "[g]overnmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *Aris Gloves, Inc. v. United States*, 190 Ct.Cl. 367, 374, 420 F.2d 1386 (1970). While the United States Supreme Court (Supreme Court) has found conclusively that such regulatory takings may and do occur, it has not instituted a "set formula" for determining when governmental regulatory action becomes a compensable taking. *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646. Instead, because of the essentially factual nature of a takings claim, each claim is analyzed on an ad hoc, case-by-case basis. *Ruckelshaus*, 467 U.S. at 1006, 104 S.Ct. 2862 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62

31. *Id.* at 786.

32. *Id.* at 190.

33. The emphasis on "healthy" eggs is important, as plaintiff concedes that it is only seeking compensation for its SE-free eggs. Plaintiff calculates the number of said eggs by using approximations of how many eggs probably were SE infected-an amount that is considerably low. Indeed, out of 20,000 eggs, the parties estimate that only one to fourteen are SE positive. *Id.* at 331–335.

L.Ed.2d 332 (1979)). The Supreme Court nevertheless has identified significant factors for consideration in these cases, including: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646). When one of these factors is so overwhelming as to decide conclusively the validity of a regulatory takings claim, that factor may dispose of the claim altogether. *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862.

Plaintiff maintains defendant took its healthy eggs and layer houses by severely restricting their permitted use. Plaintiff believes its evidence at trial established all three elements of the regulatory takings analysis. Defendant contends plaintiff cannot satisfy the elements because its response to the tracebacks would have been the same regardless of whether the regulations were in effect. Defendant also emphasizes that the poultry industry is heavily regulated, so plaintiff cannot argue that it had investment-backed expectations to the contrary.

### 1. Eggs

A consideration of the *Penn Central* factors is the best method for determining plaintiff's egg-related claim. Indeed, the facts and circumstances of this case indicate that the economic impact and plaintiff's investment-backed expectations are quite significant.

#### a. Economic impact

■ This prong of the *Penn Central* test ensures that "not every restraint imposed by government to adjust the competing demands of private owners [will] result in a takings claim." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176 (1994) (citing *Penn. Coal*, 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.")). Plaintiff must show a serious financial loss from the regulatory imposition. *Id.* at 1177. Specifically, it must prove that the regulation denied the economically viable use of its property. *Id.* (citing *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987)). This factor looks at the property's fair market value and whether it has been reduced as a result of the regulations. *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1567 (Fed.Cir.1994).

■ Plaintiff contends the economic impact of the SE regulations was severe because they prevented plaintiff from selling healthy eggs in the table egg market. Plaintiff instead had to sell its eggs to the less profitable breaker egg market. Defendant argues that plaintiff only suffered a de minimis loss from this action because plaintiff incurred cost savings from producing breaker eggs. Defendant also asserts that plaintiff would have undertaken the same actions when it discovered the subsequent SE outbreaks, regardless of whether it was ordered to do so by the regulations. In addition, defendant argues that plaintiff did not bear a disproportionately heavier burden under the SE regulations because, without the regulations, plaintiff would have been subject to legal action by persons who consumed the infected eggs.

Plaintiff offered credible evidence at trial on the severity of the economic impact of the regulations. This testimony established that plaintiff was forced to divert over 57.5 million dozens of its healthy eggs to the breaker egg market. If there were no restrictions, plaintiff would have been able to sell these eggs at a higher price in the table egg market, thus generating higher revenue.

Indeed, the average cost for plaintiff to produce a dozen eggs during the period of restriction was 54.96 cents. Plaintiff received on average, however, only 41.46 cents per dozen for eggs sold to outside breaking plants, and only 46.64 cents per dozen for eggs processed in plaintiff's own breaking facilities. Plaintiff does not always make at least 54.96 cents per dozen when selling its

eggs to the table market. Nevertheless, plaintiff would have made more than 46.64 cents per dozen if permitted to sell its product as table eggs. The average price of table eggs during the restrictions was 59 cents per dozen.[34] This is significantly more than the 41.46 cents plaintiff received for its eggs sold to outside breaker plants, and 46.64 cents it recovered for eggs it processed in its own breaker facilities. Clearly the regulations economically impacted plaintiff's operations in more than just a minimal way.

Defendant's own witnesses at trial supported this conclusion. For example, Dr. Mason, who headed the SE Task Force for four years, testified that the restrictions could mean financial ruin for table egg producers.[35] Dr. Arthur Hall added that "[b]reaker eggs are not rewarding," [36] and Dr. Eric Ebel, a current USDA employee and a former member of the SE Task Force conceded that:

> The impact of the current S.e. program is severe for affected producers. These managers [of restricted farms] incur losses in revenue through the diversion of eggs to breakers, and expend additional capital during downtime for cleaning and disinfection.[37]

Dr. Ebel also acknowledged that producers faced considerable revenue losses from the required diversion of eggs, that breakers consistently provided lower returns than table eggs, and that producers subjected to the regulations experienced losses even more severe than if they had diverted voluntarily.[38] Dr. Reiff, defendant's economic expert, calculated that plaintiff's loss on breakers alone exceeded $9.2 million.[39]

This case is similar to *Yancey v. United States*, 915 F.2d 1534 (Fed.Cir.1990), where a USDA-imposed quarantine was found to have taken healthy breeder hens belonging to the plaintiff. The quarantine prevented the plaintiff from using the hens for breeding, thus forcing them to slaughter their hens and sell the meat in order to recover some eco-

nomic return. *Id.* at 1536. The Federal Circuit affirmed this court's determination that the quarantine constituted a Fifth Amendment taking. *Id.* at 1542. The Federal Circuit concluded that "[a]lthough plaintiffs were able to mitigate their loss by slaughtering the flock, there was *no other alternative*, economically viable use for the flock while the quarantine was in effect." *Id.* at 1539.

In the present case, plaintiff sold over 97% of its eggs as table eggs before the restrictions. The SE regulations forced plaintiff to divert these eggs to the breaker market. This was not an economically viable option for plaintiff because it was not able to recoup its investment in these diverted eggs. Much like the plaintiff in *Yancey*, who was forced to sell its breeder hens for slaughter, the restrictions in this case made plaintiff sell its healthy eggs to a much less profitable market. Indeed, as the Seventh Circuit stated in its opinion on plaintiff's constitutional challenge to the regulations, "[a]n 'alternative' that is less attractive financially than slaughter is the functional equivalent of a command to destroy the animals." *Rose Acre Farms*, 956 F.2d at 672. The economic impact of the diversion was indeed severe.

### b. Investment-backed expectations

This factor "limit[s] takings recoveries to owners who [can] demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Loveladies Harbor*, 28 F.3d at 1177. The investment-backed expectation "must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus*, 467 U.S. at 1005–06, 104 S.Ct. 2862 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980)). It must be reasonable. *Id.* at 1006, 104 S.Ct. 2862.

Plaintiff maintains it reasonably expected that it could sell its healthy eggs as table

---

34. *Id.* at 1575.

35. *Id.* at 789.

36. *Id.* at 904.

37. Jt. Ex. 44 at 4. Tr. at 322.

38. Tr. at 325–27.

39. *Id.* at 1518.

eggs in interstate commerce. The restrictions imposed by the regulations prevented plaintiff from distributing eggs in this manner. Plaintiff also emphasizes that the regulations went into effect after it had heavily invested in table-egg production. The SE regulations marked a departure from the prior regulations governing plaintiff's egg-producing operations. Plaintiff asserts the prior regulations gave plaintiff no reason to expect that its "good" eggs would be condemned.

Defendant contends the poultry industry is highly regulated, especially to control the spread of communicable diseases. Defendant therefore argues that plaintiff knew it could be subjected to stricter regulations at some point. Defendant also maintains that plaintiff had no reasonable expectation to sell SE-infected eggs in interstate commerce.

Prior to 1990, the regulatory scheme governing the egg industry was limited to egg-grading standards. 21 U.S.C. §§ 1031–1056. These standards resulted from defendant's belief that diseases, such as *salmonella*, generally existed outside of the shell, and could only enter the egg through cracks.[40] Thus, eggs were "graded" to ensure that no such cracks existed. The prevailing law before 1990 also compensated producers when their eggs were destroyed by government mandate, even if these eggs were contaminated. 21 U.S.C. §§ 114a, 134a. Defendant's witness, Dr. Robert Tauxe, chief of the Foodborne and Diarrheal Diseases Branch at CDC, acknowledged at trial that CDC and the Food and Drug Administration concluded in the 1970's that shell eggs were neither a hazardous food nor associated with foodborne salmonellosis.[41] Indeed, CDC concluded that the egg grading standards "eliminated human consumption of high-risk shell eggs."[42] In fact, raw eggs were again considered safe to eat.[43] It was not until after the SE regulations were enacted that CDC re-classified shell eggs as a potentially hazardous food.

As defendant points out, the poultry industry in general is highly regulated. Nevertheless, the issue of *salmonella* in eggs is not an area that experienced much regulation before 1990. Based on the facts, it is quite reasonable for plaintiff to have had an investment-backed expectation that its healthy eggs would not be restricted from sale as table eggs. The result of the SE regulations, however, was to restrict not only the SE contaminated eggs, if there were any, but also plaintiff's SE-free eggs. This change in the law was not foreseeable, considering defendant's prior conclusion that the grading system eliminated the problem of SE in eggs. This element of the regulatory takings analysis favors plaintiff.

#### c. Character

The character factor requires the court to "consider the purpose and importance of the public interest reflected in the regulatory imposition." *Loveladies Harbor,* 28 F.3d at 1176. A regulation that burdens private property may "constitute a 'taking' if [the burden is] not reasonably necessary to the effectuation of a substantial public purpose." *Penn Central,* 438 U.S. at 127, 98 S.Ct. 2646. The fundamental purpose of the Takings Clause is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). The regulations at issue can be examined under the lens of state nuisance law. "If the regulation prevents what would or legally could have been a nuisance, then no taking occurred. The state merely acted to protect the public under its inherent police powers." *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir. 1994).

Plaintiff argues that defendant overreacted to the isolated SE outbreaks by enacting scientifically unsupported regulations. Plaintiff maintains the regulations were based on a flawed premise—that if hens or their environment tested positive for SE, the eggs

---

**40.** *Id.* at 692.

**41.** *Id.* at 673–74.

**42.** *Id.* at 673.

**43.** *Id.*

were presumptively positive. Plaintiff argues the regulations "went too far" and were not in the public's interest.

Defendant contends its actions were a proper exercise of the government's police power. Defendant also maintains that conduct promoting the health and safety of the public does not constitute a taking. Defendant analogizes the *salmonella* outbreaks to nuisance law. In addition, defendant asserts the public has a compelling interest in controlling the spread of SE.

As discussed above, the court concludes the SE regulations were misguided because they relied on ineffective testing methods. *Salmonella* may be considered a nuisance, but defendant has not established that the *salmonella* epidemic was largely the result of plaintiff's eggs. It is true that the public has a strong interest in eating safe food, however, the regulations at issue went too far in protecting this interest by prohibiting the sale of plaintiff's healthy eggs as table eggs.

Moreover, plaintiff shared a disproportionate amount of the burden of the SE regulations. APHIS administered USDA's SE traceback program until mid–1995. In 70% of the reported SE outbreaks, a probable source could not be determined. As of 1996, there were more than 1,000 large flocks with SE in the United States, nevertheless, USDA restricted only thirty-eight of them between 1990 and 1994. In total, over 1.3 billion eggs were diverted, pursuant to the regulations. Restricted eggs from plaintiff represented more than one-half of this amount (approximately 700 million). The Federal Circuit has asked the pertinent question "has the Government acted in a responsible way, limiting the constraints on property ownership to those necessary to achieve the public purpose, and not allocating to some number of individuals, less than all, a burden that should be borne by all?" *Florida Rock Indus.*, 18 F.3d at 1571. The answer to this question is "no." [44]

The court therefore concludes that the SE regulations posed an unlawful taking of plaintiff's healthy eggs. Plaintiff is entitled to just compensation for the loss of these eggs.

### 2. Houses

■ Plaintiff also argues that its restricted hen houses were temporarily taken while being wet cleaned and awaiting reinspection. Plaintiff maintains their use was severely limited, which disrupted plaintiff's entire operation. Plaintiff seeks compensation for loss of production, overall disruption costs, and cleaning and disinfection costs. Defendant contends that plaintiff cannot claim there was a temporary taking because the houses themselves were not restricted. Defendant asserts that requiring houses to be tested, cleaned, disinfected, and monitored did not interfere with plaintiff's property rights. In addition, defendant argues plaintiff is merely seeking consequential damages with this claim, which takings law precludes.

Since plaintiff is only alleging that its houses were taken for certain periods of time, plaintiff is raising a temporary regulatory takings claim. Indeed, it regained full use of the houses after the restrictions were lifted. This is in contrast to its claim for healthy eggs, which were taken permanently because the specific eggs that were regulated, totaling nearly 700 million, could not be used again after they were sent to the breaker plants. The question of whether or not there has been a temporary regulatory taking depends on the particular circumstances of the case. *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 336, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).

As a preliminary matter, the court must separate plaintiff's actual takings claim from its allegation of consequential damages. Indeed, plaintiff's assertions of loss of production, overall disruption costs, and cleaning and disinfection costs are merely conse-

---

**44.** The court also finds unpersuasive defendant's argument premised on the government's police power. Unlike state governments, the federal government has no inherent police power. *United States v. Morrison*, 529 U.S. 598, 619 n. 8, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) ("[T]he prin-

ciple that '[t]he Constitution created a Federal Government of limited powers, while reserving a generalized police power to the States, is deeply ingrained in our constitutional history.' ") (citations omitted).

quences of the regulations.[45] These consequential damages are not recoverable. *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed.Cir.1990) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949)); *see also General Motors Corp.*, 323 U.S. at 379, 65 S.Ct. 357; *Yancey*, 915 F.2d at 1542; *Georgia–Pacific Corp. v. United States*, 226 Ct.Cl. 95, 147, 640 F.2d 328 (1980); *Foster v. United States*, 2 Cl.Ct. 426, 445 (1983).

What remains, therefore, is plaintiff's allegation that the regulations caused a taking of its layer houses during the periods of cleaning, disinfection and inspection. Specifically, plaintiff argues the extra time it took to wet clean the houses, as opposed to plaintiff's normal practice of dry cleaning, served as a taking of the houses for those particular days. On average, restricted houses sat empty for forty-six days while unrestricted houses were empty for five days.[46] Plaintiff also alleges that the period of nonuse while they waited for government inspection constituted a taking. The court is not convinced.

The court has stated that it believes the regulations were misguided because they required testing of the environment but not the eggs. Nevertheless, the court does not believe that longer cleaning times and the periods awaiting inspection constitute a valid claim for the taking of plaintiff's houses. As the Supreme Court recently stated, "[a] rule that required compensation for every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking." *Tahoe–Sierra Preservation Council*, 535 U.S. at 335, 122 S.Ct. 1465. The court concludes that the facts and circumstances of this case

preclude a finding that plaintiff's houses were taken by the regulations and/or their effect.[47]

**B. *Categorical taking***

■ A categorical taking is one in which *all* economically viable use has been taken by the regulatory imposition. *Palm Beach Isles Assoc.*, 231 F.3d at 1357. This takings claim is distinct from a general regulatory taking which "prohibits or restricts only some of the uses that would otherwise be available to the property owner." *Id.* There is no need for the property owner to prove an investment-backed expectation for a categorical takings claim. *Id.* at 1364. Indeed, a categorical taking is akin to a physical taking. *Id.* at 1357.

■ Plaintiff contends that defendant's appropriation of 6,741 of its hens for SE testing constitutes a categorical taking. Plaintiff emphasizes that the existence of SE in the hens, which was limited to only a small amount of those tested, did not prove that SE actually existed in plaintiff's eggs. Defendant maintains that categorical takings claims apply to real property, which is not at issue in this case.

Contrary to defendant's assertions, a categorical taking is not limited to real property. Indeed, courts have found the principle to apply to personal property as well. *Armstrong*, 364 U.S. at 46–48, 80 S.Ct. 1563 (government's seizure of boats on which plaintiff held mechanics lien a taking); *Nixon v. United States*, 978 F.2d 1269, 1284–85 (D.C.Cir.1992) (seizure of former president's papers a taking). Defendant's attempt to preclude plaintiff's claim with such a superficial statement of the law is unsuccessful.

---

**45.** In fact, it is debatable whether plaintiff's claim for the taking of its houses is an actual takings claim or just another request for consequential damages.

**46.** Plaintiff's Exhibit (Pl.'s Ex.) 318; Tr. at 1235, 1576–77.

**47.** The court does not explicitly discuss the *Penn Central* factors in this section because it believes the facts and circumstances as a whole prove there was no taking. The *Penn Central* test is premised on a facts and circumstances analysis. *Tahoe–Sierra Preservation Council*, 535 U.S. at

336, 122 S.Ct. 1465. The parties seem to agree with this approach, as they do not specifically discuss the *Penn Central* factors in relation to this claim. Regardless, the court believes that fairness and justice do not dictate that the public bear the burden of the expenses plaintiff incurred from the cleaning, disinfection, and inspection of its houses. *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862 (determining that when one of the *Penn Central* factors is so overwhelming as to decide conclusively the validity of a regulatory takings claim, that factor may dispose of the claim altogether).

As for the merits of plaintiff's categorical takings claim, the court has already concluded that defendant's testing procedures were flawed. Said testing focused on the hens and their environment. Defendant never actually tested the eggs for SE, despite the fact that such testing was feasible and would have been directed at the alleged source of the SE outbreaks. Plaintiff offered testimony at trial that proved SE can exist in a hen and still not contaminate the eggs it produces.[48] Because the court believes defendant's testing methods were misguided, and since defendant did appropriate 6,741 of plaintiff's hens for this testing, the court concludes that defendant did categorically take said hens. Plaintiff is entitled to just compensation for this taking.

### C. 21 U.S.C. § 134a

Plaintiff also asserts in Count II of its complaint that it seeks compensation under 21 U.S.C. § 134a, which allows for the seizure, quarantine, and disposal of livestock or poultry to guard against the introduction or dissemination of communicable disease. The statute provides certain payment provisions for these activities. Defendant argues the statute is inapplicable because the Secretary did not declare an "extraordinary emergency" related to SE.

Section 134a states, in pertinent part:

[T]he Secretary shall compensate the owner of any animal, carcass, product, or article destroyed pursuant to the provisions of this section. Such compensation shall be based upon the fair market value as determined by the Secretary, of any such animal, carcass, product, or article at the time of the destruction thereof. Compensation paid any owner under this subsection shall not exceed the difference between any compensation received by such owner from a State or other source and such fair market value of the animal, carcass, product, or article.

The court interprets this statute as applying only to plaintiff's egg and hen-related claims. The court has concluded that pursuant to the Fifth Amendment, plaintiff is entitled to compensation for these items. Section 134a does not provide plaintiff any additional relief.[49]

### III. Just Compensation

The court has concluded that plaintiff is entitled to just compensation for the taking of its healthy eggs and hens. Indeed, plaintiff "is to be put in the same position monetarily as [it] would have occupied if [its] property had not been taken." *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (citation omitted). Plaintiff seeks the following compensation: (1) $7,376,050.77 for restricted egg sales; (2) $15,671.99 for losses from layer hens taken for necropsy; (3) $2,987,460.05 for empty house losses from depopulation through inspection; (4) $1,432,034.44 for reduced production during restricted periods before required depopulation; (5) $2,769,134 for reduced production during unrestricted periods before required depopulation; (6) $2,158,307.93 for cleaning and disinfection costs; (7) $44,574.82 for purchase of table eggs to cover obligations; (8) $70,656.78 for storage costs for restricted eggs; (9) $5,961,550.64 for losses due to disruption of overall business; and (10) interest. The total of these amounts, excluding interest, is $22,815,441.42. After accounting for revenue plaintiff received for the sale of its breeder eggs and started pullets, which equals $1,226,426.04,[50] the total amount plaintiff seeks is $21,589,015.38, plus interest.

### A. Consequential damages

A threshold issue related to plaintiff's damages request is the determination of consequential damages. Defendant argues that takings law does not provide for the recovery

---

**48.** Tr. at 482–83.

**49.** The court notes that plaintiff has not set forth any specific claims related to section 134a, and does not mention this statute in its post-trial briefing.

**50.** The treatment of this revenue in relation to plaintiff's costs is discussed below.

of said damages, which may result from the actual taking. Plaintiff maintains that the damages it seeks are not consequential.

■ Not all losses that plaintiff suffers as a result of a taking are compensable under the Fifth Amendment. *United States ex rel. Tennessee Valley Authority v. Powelson*, 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). "It is a well settled principle of Fifth Amendment taking law . . . that the measure of just compensation is the fair value of what was taken, and not the consequential damages the owner suffers as a result of the taking." *Yuba Natural Resources*, 904 F.2d at 1581 (citing *Kimball Laundry Co.*, 338 U.S. at 7, 69 S.Ct. 1434); *see also General Motors Corp.*, 323 U.S. at 379, 65 S.Ct. 357; *Yancey*, 915 F.2d at 1542; *Georgia–Pacific Corp.*, 226 Ct.Cl. at 147, 640 F.2d 328; *Foster*, 2 Cl.Ct. at 445. Examples of costs that are not recoverable because they are consequential are destruction of the business, frustration of contract or business, the cost of compliance with the regulations, the losses sustained by the owner because of the difficulty of finding other premises, moving costs, and expenses incurred in having to readjust manufacturing operations. *See, e.g., Mitchell v. United States*, 267 U.S. 341, 345, 45 S.Ct. 293, 69 L.Ed. 644 (1925); *Atlas Corp. v. United States*, 15 Cl.Ct. 681, 688 (1988), *aff'd*, 895 F.2d 745, 755–56 (Fed.Cir.1990), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990); *Klein v. United States*, 179 Ct.Cl. 910, 915, 375 F.2d 825 (1967), *cert. denied*, 389 U.S. 1037, 88 S.Ct. 770, 19 L.Ed.2d 824 (1968).

■ The court concludes that plaintiff's request for damages to cover: (1) reduced production during restricted periods before required depopulation; (2) reduced production during unrestricted periods before required depopulation; (3) cleaning and disinfection costs; (4) purchase of table eggs to cover obligations; (5) storage costs for restricted eggs; and (6) losses due to disruption of overall business; is an attempt to recover consequential damages, and there-

fore, is denied. Specifically, the reduced production costs and losses due to the disruption of its overall business are claims related to the frustration of its business. Plaintiff cannot recoup these expenses. *Klein*, 179 Ct.Cl. at 915, 375 F.2d 825. Also, its request for cleaning and disinfection costs is an example of expenses it incurred while complying with the regulations. These too are not recoverable. *Atlas*, 15 Cl.Ct. at 688. The same is true for the storage costs and the purchase of table eggs to cover obligations, which were incidental expenses related to the restrictions.

In addition, the court notes that plaintiff is not entitled to damages for losses related to plaintiff's empty houses. This description pertains to most of the costs plaintiff asserts. The court has concluded that plaintiff does not have a viable takings claim for the temporary impediment to its use of the layer houses.

### B. *Losses from restricted egg sales*

The court does believe, however, that plaintiff has asserted a valid takings claim for the diversion of its healthy eggs during the time of restriction. Plaintiff seeks $2,641,635 for the eggs it was forced to process in its own breaker facility. Plaintiff asks for $4,734,415.77 for the healthy eggs it sold to outside breakers. The total amount for the losses of the diverted eggs is $7,376,050.77. This figure takes into account the revenue plaintiff received from selling the eggs as breaker eggs. Said revenue is subtracted from the overall expenses plaintiff incurred.[51] The $7,376,050.77 is the total after making this subtraction.

Defendant argues the amount plaintiff requests is inaccurate, because plaintiff's expert witness, Dr. Richard Just, made numerous critical errors in his analysis.[52] Defendant contends Dr. Just incorrectly assumed that plaintiff would not have responded in the same way to the SE tracebacks if the regulations were not in effect. Defendant also claims Dr. Just overstated

---

**51.** *Id.* at 1196.

**52.** Some of the alleged errors defendant raises in its briefs are no longer pertinent because the

court has already discounted them. The court, therefore, only addresses defendant's arguments that still have relevance.

the hens' laying rate that would have occurred in the but-for world. Defendant further asserts that Dr. Just fails to account for eggs produced at unrestricted houses. In addition, defendant believes Dr. Just applied incorrect farm-wide productivity data to his analysis.

As for defendant's claim that plaintiff's response to the tracebacks would have been the same if there were no regulations, the court has already concluded that plaintiff presented credible evidence to the contrary. The court restates this fact to emphasize that Dr. Just's assumptions on plaintiff's actions in the but-for world are accurate.

Moreover, the court found Dr. Just's testimony at trial very credible. For example, Dr. Just made clear that he applied a layer rate of 0.70475 per hen each day for his farm-wide productivity data.[53] The court has made the factual finding that approximately 0.7 is an accurate representation of the laying rate, pursuant to credible testimony plaintiff presented. Dr. Just, therefore, did not err when he used 0.70475 in his farm-wide productivity data. He also emphasized that he accounted for hens that were not laying because of special circumstances such as remodeling of the houses.[54] In addition, the court believes that Dr. Just did not overstate the hen's laying rate in the but-for world, and that he properly considered the effect of eggs produced at unrestricted houses.

The court concludes that Dr. Just's calculations are credible and that they accurately reflect plaintiff's damages related to the taking of its healthy eggs. Plaintiff is therefore entitled to $7,376,050.77 for the loss of said eggs.

### C. Losses for hens taken for necropsy

Plaintiff also seeks $15,671.99 for its hens defendant took for necropsy. The court has held that plaintiff's categorical takings claim for these hens is valid. Defendant has focused on challenging the takings portion of plaintiff's claim related to the birds. It has set forth no specific arguments questioning the accuracy of the $15,671.99 amount. Since defendant appears to not challenge this sum, and because the court believes Dr. Just accurately determined this figure, the court concludes that plaintiff is entitled to $15,671.99 as just compensation for the hens taken for necropsy.

### D. The effect of plaintiff's revenue for breeder eggs and started pullets

As mentioned above, plaintiff seeks total losses of $21,589,015.38, excluding interest. Plaintiff reached this amount after subtracting $1,226,426.04 of revenue it received from breeder eggs and started pullets sales. Plaintiff originally sought $22,815,441.42, excluding interest, before making this subtraction.

If the court were awarding plaintiff all of the damages it seeks, the treatment of this revenue would not be an issue because Dr. Just properly considered it in his report. The court, however, is only allowing plaintiff to recover $7,376,050.77 for the taking of its healthy eggs and $15,671.99 for the taking of its hens for necropsy. The total of these amounts is $7,391,722.76. The court must therefore consider how the revenue plaintiff received from the breeder eggs and started pullets affects this award.

Before making this determination, it is worth noting that Dr. Just also included in his reports revenue from the sale of eggs purchased to cover obligations. This amount has already been accounted for, however, in plaintiff's calculation of eggs purchased to cover obligations, which the court has concluded is only a consequential damage.[55] Plaintiff originally requested $664,579.12 for this expense. In its post-trial briefing it reduced the figure to $44,574.82, because it subtracted the revenue made from the eggs purchased to cover obligations.[56] Thus, only the revenue from the breeder eggs and started pullets still needs to be taken into account.

---

**53.** Tr. at 1595.

**54.** Tr. at 1596.

**55.** *Id.* at 1229.

**56.** Pl.'s Ex. 318; Tr. at 245.

If this revenue can be related to a specific cost plaintiff incurred, then it may not affect the total amount the court awards plaintiff. For example, the revenue plaintiff received from the sale of the eggs purchased to cover obligations was offset by the costs plaintiff incurred from initially buying these eggs. There is a clear correlation between the expense and the revenue. This is not the case, however, with the breeder eggs and started pullets. There is no clear corresponding expense that can be offset by this revenue.

The lack of a clear nexus between the revenue and a specific expense does not mean the revenue should be ignored. Indeed, plaintiff sold its breeder eggs and started pullets as an attempt to minimize its losses during the restriction period.[57] Much of these losses were a result of the restriction of plaintiff's healthy eggs. The court therefore believes the amount plaintiff receives for the taking of its healthy eggs should be offset by the revenue plaintiff earned by the sale of the breeder eggs and started pullets. Thus, the $7,391,722.76 plaintiff has established as its damages from the taking of its healthy eggs should be reduced by the $1,226,426.04 plaintiff received as revenue. This leaves an amount of $6,165,296.72.

E. *Interest*

Plaintiff therefore is entitled to $6,165,296.72, plus interest computed from the date of the taking to the date of payment. The parties dispute, however, the type of interest plaintiff should receive. Plaintiff argues that compound interest is appropriate compensation for the time value of its commercial property taken. Plaintiff also believes it sufficiently replaces the investment opportunities plaintiff lost when defendant took said property. Defendant disagrees claiming that plaintiff should receive simple interest equivalent to the rate used for government borrowing.

■■■■ In general, interest on a claim against the government may be awarded only pursuant to a contract or if it is expressly provided for by an Act of Congress. 28 U.S.C. § 2516(a) (1994). An exception to this

rule, however, arises when a taking entitles a claimant to just compensation under the Fifth Amendment. *United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *Whitney Benefits, Inc. v. United States,* 30 Fed.Cl. 411, 414 (1994). Indeed, plaintiff is entitled to interest computed from the date of the taking to the date of payment by defendant. *Formanek v. United States,* 26 Cl.Ct. 332, 341 n. 11 (1992). Moreover, compound interest may be necessary "to accomplish complete justice" under the just compensation clause of the Fifth Amendment. *Dynamics Corp. of Am. v. United States,* 766 F.2d 518, 520 (Fed.Cir.1985). The court considers whether the taking affected plaintiff's investment opportunities when determining if compound interest is appropriate. *Whitney Benefits, Inc.,* 30 Fed.Cl. at 415–16.

After careful review of the facts and circumstances of this case, the court concludes that plaintiff is only entitled to simple interest, calculated using the 52–week treasury bill rate. Although plaintiff has requested that the Contract Disputes Act (CDA) rate be used, there is no statutory mandate for CDA rates. *NRG Co. v. United States,* 31 Fed.Cl. 659, 665 (1994). While it is common to use CDA rates, the court has opposed them where they would provide "a windfall to property owners well in excess of their economic loss." *Id.* at 670.

■■■■ Just compensation should ensure that the owner "is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984). Neither compound interest nor CDA rates are appropriate, because the court does not believe that the taking of plaintiff's healthy eggs and hens significantly affected its investment opportunities. The court has found that the application of the regulations at issue was "misguided, at best." The court recognizes, however, that the important ends of public health and safety were the purposes of these regulations. Plaintiff must be compensated for the unreasonable

---

**57.** Tr. at 1230.

application of such laws, but some costs attend even to their proper enforcement. A company engaged in the production and distribution of food cannot expect to be fully indemnified against such costs. Under these unique circumstances, awarding plaintiff the lesser 52–week treasury bill rate, calculated as simple interest, is fully "just." Said simple interest began to accumulate on October 5, 1990, which was the date plaintiff's healthy eggs were first restricted.[58]

## IV. Attorney Fees and Expenses

 Plaintiff has filed a motion for the award of attorney fees and expenses. The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970(URA), 42 U.S.C. § 4654(c), provides reimbursement in takings cases brought under the Tucker Act for "reasonable costs, disbursements, and expenses, including reasonable attorney ... fees, actually incurred because of" such proceeding. A total of $2,759,216.71 is sought, including $30,908.36 in supplemental fees related to the preparation of the URA motion. This amount includes $2,245,527.63 in attorney fees, $298,486.36 in expert and consultant fees, and $215,202.72 in expenses.

Defendant "does not dispute that, pursuant to the URA, [plaintiff] is entitled to reimbursement for the amount of reasonable attorneys' fees and costs that it actually incurred in successfully advancing its claims against the United States."[59] Defendant objects, however, to the amount claimed by plaintiff, arguing that only $1,562,753.50 is allowable as reasonable costs and expenses.

### A. *Attorney Fees*

Relying on *Florida Rock Indus. v. United States,* 9 Cl.Ct. 285 (1985), plaintiff contends that "the Court should defer to the market's discipline and treat the fees and other expenses that [plaintiff] actually paid as presumptively reasonable."[60] Indeed, when addressing the reasonableness of attorney fees,

[t]he court is reluctant to second-guess counsel's time allocation for what has proved to be a winning case. Plaintiff was entitled to hire competent counsel, and counsel, in turn, had the responsibility to undertake all reasonable efforts in securing a victory. What constitute reasonable efforts cannot be defined with precision; it is a matter of professional judgment as to which the court will allow great leeway. In a case such as this, the risk of abuse is minimal because plaintiff has no assurance of recovering and must assume it will bear the full cost of the litigation. Plaintiff can therefore be expected to exercise control over the time spent and the rates charged.

*Florida Rock,* 9 Cl.Ct. at 288–89.

Defendant asserts, however, that "plaintiff has the burden of proving a reasonable fee"[61] and argues that the court should use the lodestar method in calculating an appropriate fee award. That method consists of "determining first the reasonable hours expended and then multiplying that figure by each attorney's reasonable hourly rate." *Town of Grantwood Village v. United States,* 55 Fed.Cl. 1, 3 (2003). The lodestar formula is routinely used, but the court has stated that "where there is a bona fide contractual arrangement whereby the client has committed to pay the amount billed by the attorneys ... the court should not second-guess the workings of the market in determining the reasonableness or appropriateness of the fees and expenses." *Florida Rock,* 9 Cl.Ct. at 288. This reasoning is particularly persuasive where plaintiff has not only actually incurred and committed to pay, but has *in fact paid* all of the fees and expenses submitted for the court's review. The court accepts this standard, absent a showing of abuse such as fees that are "excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart,* 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Plaintiff, however, still has the "burden of demonstrating that the amount sought for attorneys' fees and costs

---

58. Joint Stipulation Of Events at 2.

59. Defendant's Opposition To Plaintiff's Motion For Award Of Attorneys' Fees And Expenses (Def.'s Opp'n) at 2.

60. Rose Acre's Memorandum In Support Of Motion For Fees And Expenses (Pl.'s Mot.) at 2.

61. Def.'s Opp'n at 4.

meets statutory requirements." *Preseault v. United States,* 52 Fed.Cl. 667, 670 (2002) (citing *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933).

■ The relevant component of the URA states that "reasonable" attorney fees and expenses "actually incurred because of" this proceeding shall be reimbursed to plaintiff. 42 U.S.C. § 4654(c). Although plaintiff is accorded great leeway with respect to what constitutes a "reasonable fee," it can recover no fees or expenses that were not incurred "because of" the takings claim or those that were not "actually incurred." Further, where "plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hensley,* 461 U.S. 424 at 440, 103 S.Ct. 1933. In other words, "plaintiff should not recover for time spent litigating issues as to which it did not prevail." *Florida Rock,* 9 Cl.Ct. at 289.

Defendant alleges each of these deficiencies with respect to various aspects of plaintiff's motion. It is argued that certain fees were not a part of the present litigation and therefore not "because of" this proceeding; that certain fees were not "actually incurred;" and that certain fees and expenses are unreasonable because they are redundant or unsubstantiated. The court will consider each of these arguments.

#### 1) Pre–Litigation Fees

Defendant objects to $23,075.21 in fees incurred prior to October 13, 1992, the date plaintiff filed its complaint with the court in this proceeding. Defendant alleges that the work associated with these fees was incurred as part of proceedings before the United States Court of Appeals for the Seventh Circuit or related to a May 8, 1992, complaint before this court, which was subsequently dismissed.

■ The United States Court of Appeals for the Federal Circuit has held that "prelitigation expenses are precluded from reimbursement under 42 U.S.C. § 4654(c)." *Yancey v. United States,* 915 F.2d 1534, 1543 (Fed.Cir.1990). Plaintiff counters, "[t]he fact that Rose Acre began preparing its complaint in December 1991 does not mean this time is not compensable. It took Rose Acre a considerable amount of time and effort to investigate the relevant facts, research the relevant law, and marshal these facts into a persuasive pleading." [62] *Yancey* acknowledged this effort and held that " 'the significant effort expended' in 'the filing of the petition' may be compensable under the statute if proper documentation were provided." *Id.* (quoting *Cloverport Sand & Gravel Co. v. United States,* 10 Cl.Ct. 121, 124 (1986)).

■ The leeway accorded by the presumption of reasonableness does not extend to fees which are arguably incurred as part of a prior proceeding. It is clear from the billing records that a large portion of the bills during that period relate to drafting the complaint in this proceeding. The court finds the documentation insufficient, however, to determine whether all of these fees are properly attributed to this action. For instance, a $650 entry on February 12, 1992, indicates, in part, "telephone conferences with Marcus Rust re 7th Circuit decision ...." [63] Another entry for $700 on April 29, 1992, includes a charge for a "telephone conference with Brian Burke re status of appeal." [64] Yet another entry, on August 27, 1992, includes a charge for reviewing the "petition for cert." [65] It is possible that some part of these and other similar charges would have been incurred during the preparation of the present action, prior proceedings notwithstanding. Ambiguity should be resolved, however, against the claimant, *White Mountain Apache Tribe of Arizona v. United States,* 30 Fed.Cl. 8, 21 (1993). After reviewing the billing records, the court believes that no more than 25 percent of those fees claimed as unallowable by defendant could, in

**62.** Rose Acre's Reply In Support Of Motion For Attorneys' Fees And Expenses (Pl.'s Rep.) at 5.

**63.** Pl.'s Mot., App. Volume II.

**64.** *Id.*

**65.** *Id.*

fact, be related to an earlier proceeding. Plaintiff's total award is reduced accordingly, by $5,768.80.

### 2) Fees Not "Actually Incurred"

Defendant also objects to $15,056.48, which represents fees paid to the firm of Spriggs & Hollingsworth (Spriggs) as local counsel. There is no dispute, however, that the billing records from Spriggs relate to work done in this proceeding. Defendant contends that these fees were not actually incurred by plaintiff because Spriggs billed plaintiff's primary counsel, Sommer Barnard Ackerson (Sommer Barnard), and no fee agreement showing an obligation to pay these bills by Sommer Barnard has been presented.[66] Plaintiff counters by affidavit that these fees were, in fact, incurred and paid in full.[67] Plaintiff is entitled to a reimbursement of said fees.

### 3) Unallowable Fees

Defendant argues that some portion of plaintiff's fees are not reimbursable because they are insufficiently documented, redundant, or related to issues on which plaintiff did not prevail.

On the issue of redundant or excessive billing, it is asserted that "[t]here is no doubt that Rose Acre's counsel heavily staffed this case."[68] As evidence, defendant recites the number of lawyers working on the case at various times, including that during 2001, Sommer Barnard "staffed at least 15 attorneys and at least two legal assistants on the case, including five new attorneys."[69]

Plaintiff counters, however, that these numbers are misleading. Many of these attorneys were summer associates or others with lower billing rates than those who might have otherwise worked on the case. To that end, the large number of attorneys may have been a cost savings device as likely as an indication of abusive staffing or billing practices. Under any circumstances, as this court has stated before, an argument "that plaintiff's hours are excessive because they greatly exceed those spent by defense counsel overlooks a number of important considerations. Plaintiff can be expected to work harder because it carries the burden of proof." *Florida Rock*, 9 Cl.Ct. at 289. This is especially true in a regulatory takings case. There is no apparent abuse in the staffing or billing, and for the reasons stated above, the court will not second-guess plaintiff's decisions in this regard.

Defendant next argues that plaintiff's award should be reduced by $395,305.62, which is the total of all its bills with material redacted.[70] It is alleged that "[i]t is impossible to discern to what the redacted work relates, or if it relates to this case at all." [71] This argument, however, is unpersuasive. Plaintiff contends that its redactions serve the purpose of protecting privileged entries. The court could request an *in camera* review of the unredacted pages, but it is not necessary to do so. The court is mindful of the injunction that "[a] request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933. The redactions eliminate single words and phrases, but by taking each entry in its context, it is clear enough that all of the fees charged relate to this proceeding. Defendant is troubled by lines redacted that immediately follow the "Total Charges For This Bill" entry on a certain number of the bills and speculates that these redactions may hide discounts or other indications that the fees listed were not actually incurred. The court is satisfied that this is not so. Sommer Barnard used a standard billing form and it is clear from invoices not redacted that these lines refer to periodic unpaid balances. What is important for URA purposes is that the fees were actually incurred and paid, not whether they were paid on time at any given moment during the proceeding.

Finally, defendant asks for a blanket reduction of plaintiff's fee by 30 percent due to

---

66. Def.'s Opp'n at 11.

67. Supplemental Affidavit of Robert R. Clark ¶ 7.

68. Def.'s Opp'n at 25.

69. *Id.* at 26.

70. Def.'s Opp'n at 22.

71. *Id.*

bills with allegedly insufficient detail and work performed in pursuit of an untenable theory of the case.[72]

"[I]ndicating that a conference was held between members and associates of the firm, without any indication of the subject matter," for instance, "does not give the Court the requisite information to glean reasonableness." [73] The court disagrees. All of the entries defendant objects to are related to the present proceeding, including those described as "block billing," where numerous tasks are grouped together under one line item. Plaintiff had the ultimate responsibility for these charges and "[p]laintiff can therefore be expected to exercise control over the time spent . . . ." *Preseault,* 52 Fed. Cl. at 680 (quoting *Florida Rock,* 9 Cl.Ct. at 289). The billing method evidences no abuse to justify a blanket reduction.

■ Defendant is more convincing when it argues that time spent pursuing a claim for consequential damages should be excluded. The court has held that, as a matter of law, plaintiff was not entitled to consequential damages. Plaintiff counters that facts "gathered during discovery and adduced at trial were indispensable to the *liability* phase" of the case and it "would not have spent any *less time* on this case even if it had not sought to recover damages the Court found to be consequential." [74] Plaintiff's point is well taken, but the court is not convinced that the abandonment of this damage claim would have resulted in zero savings. A 10 percent reduction of the attorney fee component of the URA claim is appropriate.

Plaintiff is alleging incurred attorney fees of $2,245,527.63. Notwithstanding this claim, $5,768.80 must be subtracted to account for those fees which relate to a prior proceeding. Plaintiff is entitled to the remainder, subject to a 10 percent reduction, for a total of $2,015,782.95.

### B. Expert Fees, Expenses and Costs

Plaintiff claims $298,486.36 in expert fees. Defendant argues that this total should be reduced by $103,206.95, for a total of $195,279.41, due to inefficiency and unsubstantiated charges by Drs. Patricia Curtis and Richard Just. A total of $213,774.86 in costs and expenses is also claimed by plaintiff, which defendant argues should be reduced by 40 percent for allegedly failing to make a sufficiently detailed report of those expenses.

Defendant argues that it should not be made to pay $10,000 of the fees charged by Dr. Curtis because the invoices presented by her did not specify in a detailed manner how her time was spent. Since she was present at trial for 10 days, however, defendant concedes that $16,000 of the total is reasonable. Plaintiff counters that "Dr. Curtis was paid the lesser of $200 per hour or $2,000 per day for her time. For trial, Dr. Curtis spent 13 days in Washington, beginning on Sunday April 28, 2002, and staying through and including Friday, May 10." [75] It is reasonable that Dr. Curtis would have spent more time on the case than the bare number of hours in trial, thus no reduction in her fee is warranted.

■ Defendant also objects to $93,206.95 of Dr. Just's fees on the premise that his work was a duplication of that done by the Law and Economic Consulting Group (LECG). Dr. Just was at one time affiliated with LECG and its staff did much of the preliminary work collecting and analyzing the market and other data that helped plaintiff substantiate its takings claim. Defendant asserts, however, that an undue amount of time was spent by Dr. Just duplicating the work of LECG because the initial work was unsatisfactory. Dr. Just stated that he "came to realize that some of the information I had been provided by the LECG people when I came into the case was not quite correct." [76] Plaintiff argues, however, that it "was entitled to have its expert expend the

---

**72.** *Id.* at 17–18, 29.

**73.** *Id.* at 18.

**74.** Pl.'s Rep. at 14 (emphasis in original).

**75.** *Id.* at 15.

**76.** Def.'s Opp'n, App. 3.

time and energy he deemed appropriate to hone, sharpen and fine tune these massive amounts of cost and price data and to present the most compelling economic case the data would support."[77] The court agrees with this statement, but costs that are "excessive, redundant, or otherwise unnecessary" cannot be recovered under the statute. *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. "For this reason the costs of having one set of experienced, competent, and highly paid attorneys review the work of another set of experienced, competent, and highly paid attorneys is not reasonable." *Preseault,* 52 Fed.Cl. at 680. The same logic applies to experts, thus the court accepts defendant's proposed $93,206.95 reduction of Dr. Just's fees. Plaintiff is entitled to a total of $205,279.41 in expert fees.

Lastly, defendant claims that plaintiff's "documentary support for most of its requested costs falls well-short"[78] of what is necessary to determine their reasonableness. This includes computerized research, photocopying, telephone, and courier charges. It is also argued that certain travel expenses were excessive. Plaintiff avers that during ten years of litigation it has amassed "bankers' boxes full of receipts and related documentation"[79] which would allow it to present more detailed documentation if necessary. Instead, it has chosen to list the type and purpose of each charge on a monthly basis, summarized on its bills. It is certain from the bills presented that the vast majority of the costs claimed were reasonable. It is also undeniable that plaintiff's approach has the benefit of judicial economy. "As with attorney's fees, the court will not second-guess counsel's decision to incur expenses it thought necessary to properly present its case. Since plaintiff had no assurance of winning, and therefore no assurance of recovering any of its costs, there is good reason to believe that plaintiff would not have incurred frivolous or unnecessary expenses, or allowed its lawyers to do so." *Florida Rock,* 9 Cl.Ct. at 291. The court recognizes, however, that some of plaintiffs expenses were incurred solely in pursuit of those claims that it lost.

For this reason, a 10 percent offset is appropriate. Plaintiff is entitled to $193,682.45 in costs and expenses.

### Conclusion

For the above-stated reasons, the Clerk is directed to enter judgment in favor of plaintiff in the amount of $6,165,297.72, plus simple interest at the 52–week treasury rate commencing from October 5, 1990, plus $2,414,744.81 in fees and expenses. Each side to pay its own court costs.

IT IS SO ORDERED.