**ROSE ACRE FARMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 92–710C.**

United States Court of Federal Claims.

Feb. 22, 2007.

Robert R. Clark, Indianapolis, Indiana, attorney of record for plaintiff and Thomas A. Barnard, Michael D. Chambers and Geoffrey Slaughter, co-counsel.

Sheryl L. Floyd, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant. David M. Cohen, Director, and James A. Booth, of Counsel, Department of Agriculture.

### ORDER & OPINION

FUTEY, Judge.

This regulatory takings case is before the court following a second trial on liability and damages. Plaintiff maintains that regulations enacted by the United States Department of Agriculture (USDA), which placed restrictions on chicken farms suspected of selling *salmonella*-infested eggs, caused a taking of plaintiff's healthy eggs at three of its farms. Plaintiff argues the restrictions had a severe economic impact on its operations, interfered with its investment-backed expectations, and were not in the public's best interests. Plaintiff asserts a general regulatory takings claim for its healthy eggs. Plaintiff seeks damages of more than six million dollars plus interest.

Defendant contends plaintiff failed to establish at trial that the regulations resulted in a taking of its property. Defendant argues that the diversion of plaintiff's eggs caused plaintiff only minimal losses. In addition, defendant asserts the regulations were a proper use of the government's police power and were in the public's best interest.

On August 29, 2002, this court found in favor of plaintiff after a nine day trial, but the Federal Circuit reversed and remanded for a determination of the economic impact of

the alleged taking on plaintiff. *See Rose Acre Farms, Inc. v. United States*, 53 Fed.Cl. 504, 524 (2002) *(Rose Acre I), superseded by* 55 Fed.Cl. 643 (2003) *(Rose Acre II) rev'd*, 373 F.3d 1177 (Fed.Cir.2004) *(Rose Acre III)*. The Federal Circuit further instructed the court to weigh the private and public interests in this case in accordance with *Penn. Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

### Factual Background[1]

Plaintiff, Rose Acre Farms, Inc., is a business incorporated under the laws of the State of Indiana with its principal place of business in Seymour, Indiana. Defendant, the United States of America, is acting by and through its agent, USDA. The Animal Plant Health and Inspection Service (APHIS), a division of USDA, administered the regulations at issue. APHIS is responsible for preventing the spread of communicable diseases in poultry, to protect the livestock and poultry of the United States.

Plaintiff is primarily a producer of poultry eggs for sale throughout the central Midwest and Great Lakes regions. It sells mainly table eggs, which are raw eggs sold in their shell.[2] Plaintiff is one of the largest egg producers in the United States, with production facilities and farms in Indiana and Iowa. The three farms at issue in this case are located in Cortland, Indiana (Cort Acres), White County, Indiana (White Acres) and Jennings County, Indiana (Jen Acres).

In the late 1980's, the Centers for Disease Control (CDC) determined there was a growing problem with *Salmonella enteriditis* ser-otype *enteritidis* (SE) in chicken eggs.[3] SE outbreaks originally were limited to the northeastern region of the United States, but between April 9 and April 11, 1989 an SE outbreak occurred in Knoxville, Tennessee that was eventually traced back to plaintiff's Jen Acres farm. On February 16, 1990, in response to the increasing SE problem, APHIS, acting on behalf of the Secretary of Agriculture (Secretary), determined that emergency regulations were necessary to identify poultry flocks infected with SE and to prevent the spread of this disease. The Secretary therefore published interim regulations, effective immediately, that restricted the interstate sale of contaminated eggs and limited the interstate transportation of contaminated poultry. 9 C.F.R. §§ 82.30–82.36 (1991). The regulations were applied to "flocks" defined as "[a]ll of the poultry on one premises." 9 C.F.R. § 82.30. The regulations did not define "premises," but USDA initially explained that the terms "flock" and "premises" meant the entire farm or egg-producing facility.

The interim regulations also required the USDA to identify an egg-production flock as a "study flock" if "a Federal or State representative determines through epidemiologic investigation that the flock is the probable source of disease in an outbreak of disease in humans or poultry caused by [SE]." 9 C.F.R. § 82.32(a). Shipping records or other evidence had to substantiate that the probable source of the eggs was the producer's flock. *Id.* If USDA designated a flock to be a study flock, it then had to perform environmental testing for SE pursuant to the regulations.[4]

1. Only facts relevant to this opinion are summarized herein. The facts were discussed in greater detail in the court's opinion following the 2002 trial, *Rose Acre II*, 55 Fed.Cl. at 646–653.

2. Table eggs are different from breaker eggs, which are sold in liquid form for use in products that require pasteurization, such as cake mixes. Table eggs command a higher price for sale than breaker eggs.

3. *Salmonella* is a gram negative rod-shaped microscopic bacterium that is ubiquitous. There are more than 2,000 serotypes (strains) of *salmonella*, and it is most commonly found in the intestinal tract of animals and birds. Persons can be exposed to *salmonella* in many ways, but the most likely exposure is through the consumption of raw or undercooked foods of animal origin, such as meat, poultry, milk or eggs. When a person becomes sick from consuming *salmonella*, the condition is referred to as salmonellosis. Symptoms in humans include nausea, vomiting, abdominal cramps, diarrhea, fever and headache. *See Rose Acre II*, 55 Fed.Cl. at 648 n. 5.

4. USDA believed, at the time, that any evidence of SE in the environment would indicate that the birds were infected, thus increasing the likelihood that they would lay SE-infected eggs. To the present date, the scientific community still does not fully understand all aspects of SE in eggs.

If one or more of the environmental samples tested positive for SE, or if the entity in control of the study flock refused environmental testing, the interim regulations mandated that the study flock be designated a "test flock." 9 C.F.R. § 82.32(b). The owner of a test flock could not freely market the test flock's eggs or the test flock itself. The regulations limited the test flock eggs to uses that required pasteurization, and allowed the interstate sale or shipment of the eggs only after the owner obtained a permit and satisfied certain requirements. 9 C.F.R. § 82.33(a). The test flock eggs could not be transported interstate for use as table eggs.

After these regulations were put into effect, three separate outbreaks of SE contamination occurred in 1990 that were traced back to plaintiff's Cort Acres, White Acres and Jen Acres farms. The first incident happened on August 11, 1990, at a brunch wedding party in Versailles, Kentucky. Forty-two guests became ill when they ate eggs benedict with hollandaise sauce. The Kentucky Department for Health Services, in conjunction with APHIS, traced the source to eggs from plaintiff's Cort Acres facility.[5] USDA then declared all thirty-six houses at Cort Acres to be a study flock. USDA took separate environmental samples from the manure and egg conveyor belts at Cort Acres, and also obtained eighteen samples from each of the houses. Some of the houses tested positive in at least one environmental sample. Based on these results, USDA declared plaintiff's entire farm at Cort Acres to be a test flock. Plaintiff's interstate movement of the eggs from that facility was therefore restricted, and its sale of the eggs was limited to the pasteurization (a.k.a. breaker egg) market. USDA eventually applied the restrictions to only the specific houses at Cort Acres that tested positive. In response

to USDA's testing, the Indiana State Board of Health notified plaintiff that it could no longer distribute, transport, or move the chickens, eggs and associated articles in intrastate commerce, except for pasteurization.[6]

A second SE outbreak occurred on September 30, 1990, at the Hyatt Regency hotel in Chicago, Illinois, where approximately 400 people became ill from SE-infected bread pudding at a True Value Hardware convention. The Chicago Health Department and the Illinois Department of Public Health jointly issued a report that traced the outbreak to eggs produced at plaintiff's White Acres farm.[7] USDA declared half of the twelve houses at White Acres to be a study flock based on this report. It then conducted environmental testing on the six houses, which came back positive. On November 27, 1990, USDA designated these six houses as a test flock, thus restricting the interstate movement of their eggs and limiting their use to pasteurization. USDA later conducted environmental testing at the remaining six houses. Some of these houses tested positive, so USDA identified the entire flock as an infected flock and imposed the applicable restrictions. On January 15, 1991, the Indiana State Egg Board imposed restrictions on plaintiff's intrastate sales of the White Acres eggs, determining that they could only be sold for pasteurization.

A third SE outbreak occurred on October 25, 1990, in Tennessee where seven people became ill when they consumed banana pudding with meringue. The Tennessee health authority determined that the suspect eggs originated from plaintiff's Jen Acres facility.[8] USDA conducted environmental testing, which came back positive. It then restricted all of the Jen Acres flocks in January 1991,

5. In 1990, Cort Acres had thirty-six houses, which were configured into four quartiles with nine houses per quartile. Each house contained approximately 70,000 hens. Cort Acres' farm-wide capacity was 2.4 million hens.

6. Cort Acres was suspected to be the source of an additional outbreak in Asheville, North Carolina on September 22, 1990. Since Cort Acres was already subject to investigation and restrictions, defendant did not notify plaintiff of this incident.

7. In 1990, White Acres had twelve houses, each of which contained approximately 125,000 hens. White Acres' farm-wide capacity was 1.5 million hens.

8. In 1990, Jen Acres had twenty-two houses, twenty-one of which were in production. Each house had capacities ranging from 67,320 to 112,000 hens. Jen Acres' farm-wide capacity was 1.5 million hens.

thus preventing the interstate movement of its eggs and limiting their sale to pasteurization markets. On February 6, 1991, USDA declared Jen Acres an infected flock. All of the houses at Jen Acres were subject to the restrictions. On January 17, 1991, the Indiana State Egg Board notified plaintiff that it was imposing restrictions on the intrastate movement of eggs from Jen Acres. Plaintiff was now only permitted to sell them in intrastate commerce for pasteurization.

In response to the SE quarantine at the three farms, plaintiff decided to build a breaker plant at Cort Acres in January 1991. Construction of said plant was completed in May 1991. The total cost of this project was approximately $6 million. Plaintiff built the facility to minimize its losses, when it was restricted to selling its eggs for pasteurization. Plaintiff also expanded its Pulaski County breaker plant to accommodate restricted eggs from White Acres.

After USDA imposed the restrictions on the movement of plaintiff's eggs, plaintiff had to depopulate, clean, disinfect and get reinspected by USDA at all layer houses in order to be allowed to sell its eggs on the table egg market again. In order to pass inspection, USDA required wet cleaning for each house, which was more expensive and time consuming than the traditional dry cleaning method. The wet cleaning damaged the electrical wiring in most of plaintiff's houses, and in fact was related to a fire that partially burned down the inside of one of the houses. USDA's inspection after the wet cleaning was limited to a visual examination with a flashlight. It did not retest the environment or the hens. Sometimes the houses were empty for long periods of time as they awaited USDA inspection.

On May 8, 1992, USDA notified plaintiff that all remaining White Acres houses had been released from the SE restrictions. The Cort Acres facility was removed from the quarantine on July 16, 1992. Jen Acres received its reprieve on October 30, 1992. Thus, defendant applied the SE regulations to plaintiff for over twenty-one months. During the entire restriction period, defendant never tested any of plaintiff's eggs.

Prior to the enactment of the regulations, over 97% of the eggs plaintiff produced were sold as table eggs, and plaintiff had invested approximately $82.2 million in its table egg business. During the restricted period, plaintiff's primary business purpose continued to be the production of table eggs, although plaintiff was forced to divert millions of eggs to breaker plants.[9] After the quarantine ended in mid–1992, plaintiff immediately returned to selling over 97% of its eggs as table eggs. In addition, before and during the SE quarantine period, plaintiff primarily sold eggs in interstate commerce. Indeed, 90% of its eggs were sold in interstate commerce leaving 10% for sale in intrastate commerce.

In total, plaintiff diverted over 57.5 million dozens (nearly 700 million eggs) to breaker plants during the restricted period. Plaintiff sold 24,006,780 dozen restricted eggs to outside breaker plants. It also processed 33,-753,843 dozen eggs in its own breaking plants, and sold the resulting liquid product to liquid-egg producers. The price plaintiff received for the breaker eggs was always less than what it would have made if it were selling table eggs.

Plaintiff filed a complaint in this court on October 13, 1992, requesting the following: (1) an amount equal to the value of the birds and eggs taken as a result of the restrictions; (2) the cost of compliance with the SE regulations; and (3) losses from a decrease in egg production. Plaintiff's claims are premised on the Fifth Amendment and 21 U.S.C. §§ 114a and 134a. Plaintiff initially sought $21,589,015.38 in damages, excluding interest. This amount includes compensation for: (1) restricted egg sales; (2) losses from lay-

---

9. A breaker plant separates an egg's liquid contents from its shell. The plant then pasteurizes (or heats) the contents to kill any bacteria within the egg. A USDA official must be present while the plant is in use. Before the restriction period, plaintiff only sent eggs of inferior quality to breaker plants. Less than three percent of its eggs met this criteria. Also, prior to the restriction period, plaintiff had one small breaker plant at its Pulaski County farm in northern Indiana. Most of plaintiff's breaker eggs, however, were sent to out-of-state breaker plants not owned by plaintiff.

ers taken for necropsy; (3) empty house losses from depopulation through inspection; (4) reduced production during restricted periods before required depopulation; (5) reduced production during unrestricted periods before required depopulation; (6) cleaning and disinfection costs; (7) purchase of table eggs to cover obligations; (8) storage costs for restricted eggs; (9) losses due to disruption of overall business; and (10) interest.

Defendant filed a motion to dismiss on January 3, 1995, arguing that plaintiff had failed to state a claim upon which relief may be granted and that the court lacked jurisdiction to hear plaintiff's claim based on sections 114a and 134a. The court dismissed plaintiff's claim under section 114a, but denied the remainder of defendant's motion in an unpublished decision issued August 7, 1995. The parties then engaged in extensive discovery. A trial was held in Washington, D.C. on April 30—May 10, 2002. In an opinion dated August 29, 2002, this court found in favor of plaintiff in part, and awarded it $6,165,297.72 plus simple interest for the lost egg sales and the taking of hens for necropsy. *Rose Acre I*, 53 Fed.Cl. at 524, *superseded by Rose Acre II*, 55 Fed.Cl. 643. This court subsequently awarded plaintiff attorneys' fees and expenses in the amount of $2,414,744.81. *Rose Acre II*, 55 Fed.Cl. at 670. Defendant appealed this decision and the Federal Circuit remanded the case to this court for reconsideration of the severity of the economic impact of the regulations on plaintiff and the "significance of that impact in light of" the *Penn Central* factors. *Rose Acre III*, 373 F.3d at 1198. This court held a two-day trial from November 30, 2006 to December 1, 2006, consisting almost entirely of expert testimony, to gather evidence on the Federal Circuit's questions.

### Discussion

■ A regulatory taking does not involve a physical invasion or seizure of property. Instead, it concerns action that affects an owner's use of property, and is based on the general rule "that 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" *767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed.Cir.1995)

(quoting *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). The government need not make use of, or take title in, the property at issue for a taking to occur because "[g]overnmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *Aris Gloves, Inc. v. United States*, 190 Ct.Cl. 367, 420 F.2d 1386, 1391 (1970). Although the United States Supreme Court (Supreme Court) has found conclusively that such a regulatory taking does occur, it has not instituted a "set formula" for determining when governmental regulatory action becomes a compensable taking. *Penn. Central*, 438 U.S. at 124, 98 S.Ct. 2646. Instead, because of the essentially factual nature of a takings claim, each claim is analyzed on an ad hoc, case-by-case basis. *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). The Supreme Court nevertheless has identified significant factors for consideration in these cases, including: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting *Penn. Central*, 438 U.S. at 124, 98 S.Ct. 2646). When one of these factors is so overwhelming as to decide conclusively the validity of a regulatory takings claim, that factor may dispose of the claim altogether. *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. 2862.

### A. Severity of Economic Impact

■ Historically, two different methods have been used to evaluate the severity of the economic impact of a regulatory taking, diminution in value and diminution in re-

turn.[10] *Compare Yancey v. United States,* 915 F.2d 1534 (Fed.Cir.1990) (finding a substantial loss where plaintiffs sold turkey flock for slaughter because temporary regulations prohibited transport of flock's eggs at a price significantly less than the flock's value as breeder turkeys) *with Cienega Gardens v. United States,* 331 F.3d 1319 (Fed.Cir.2003) (holding that a taking occurred where plaintiff suffered a 96% loss of return on its properties because legislation prohibited plaintiff from pre-paying mortgage and thereby forced plaintiff to continue running its properties as low-income housing). Although the Federal Circuit discussed the applicability of each of these methods to the case at hand, it remanded the case to this court to determine which method is more appropriate in light of the facts gathered at the two trials.

Plaintiff argues that the appropriate measure of severity is the diminution in return approach. Plaintiff's expert witness, Dr. Richard Just, testified that this is the correct way to look at the effect of the regulations in this case because "it was the destruction of profit that impacted Rose Acre as a business."[11] Dr. Just also stated that the diminution in value method is inappropriate because

> [w]hen you look at the impact on an ongoing business concern [like Rose Acre], it just doesn't make sense to look at only the value of an asset. It simply ignores costs. It ignores the profit margin. It ignores what is . . . of value to the producer, when you disrupt a business concern. . . .[12]

Dr. Just also contends that the diminution in value formulation is improper because it only measures the loss at a specific point in time instead of over the entire period of the regulation.[13] Defendant did not present any evidence on which method best demonstrates the effect of the regulations on plaintiff,[14] but instead asserts that, by any metric, the im-

pact was not severe enough for plaintiff's loss to be considered a taking.

In *Yancey v. United States,* the plaintiffs purchased a flock of turkeys to use as breeders whose eggs they planned to sell in the national market. *Yancey,* 915 F.2d at 1536. Almost immediately after plaintiffs acquired the flock, the federal government imposed regulations quarantining plaintiff's flock because of an outbreak of avian influenza. *Id.* The cost of maintaining the flock was extremely high, therefore, plaintiffs "decided that keeping the flock alive for the indefinite duration of the quarantine would be uneconomical." *Id.* As a result, plaintiffs sold the flock for meat at a 77% loss. *Id.* By using the diminution in value approach, looking at the difference between how much plaintiffs bought the flock for and how much it sold it for, the court determined that plaintiffs had suffered a compensable taking. *Id.* at 1540.

Beyond the fact that both cases involve poultry, the case at hand and *Yancey* are not factually similar. While the *Yancey* plaintiffs' turkeys never produced eggs, and hence, profits, the three farms in this case had been continually turning in earnings for a number of years. The *Yancey* court's use of the diminution in value methodology is, therefore, inapplicable here.

After reviewing the Federal Circuit's decision in this case alongside the evidence presented at trial, then, the court agrees with plaintiff that diminution in return approach provides the best understanding of the regulations' impact on plaintiff. Dr. Just's testimony clearly demonstrated that using the diminution in return is appropriate "where, as here, the issue concerns the economic impact, albeit temporary, of government regulations on a going business concern." *Rose Acre III,* 373 F.3d at 1188–89.

---

**10.** Diminution in value is sometimes referred to as "diminution in revenue" and diminution in return is interchangeable with "diminution in profit."

**11.** *Trial Transcript (Tr.) at 1735–36.*

**12.** *Id. at 1736.*

**13.** *Id. at 1736.*

**14.** Defendant's witness, Dr. Bradley Reiff, testified that "both diminution in revenue and diminution in profit are appropriate measures that the Court could employ in this case." *Tr. at 1929.*

■ The next issue, therefore, is how the court should calculate the diminution in return. Plaintiff argues, and Dr. Just testified, that plaintiff suffered a loss of $6,638,446.11 instead of making a $3,028,936.33 profit at the three farms effected by the regulations.[15] Therefore, plaintiff alleges that it sustained a 219.2% diminution in profit. These calculations reflect the loss and expected profit at the three farms less the ten percent of sales that occurred solely in intrastate commerce.[16] Plaintiff claims that because this loss of profits was so large, the regulations had a severe economic impact on the three farms.

Defendant contends that plaintiff's loss calculation is exaggerated and inappropriate to determine the severity of the economic impact of the regulations. Defendant argues that the following formula illustrates plaintiff's method of computing the diminution in profit:

$$\frac{\text{"But For" Revenue—Actual Revenue}}{\text{"But For" Revenue—Average Total Cost}^{[17]}}$$

"But for" Revenue is the average price per dozen that plaintiff would have sold the eggs in question at absent the regulation whereas Actual Revenue is what plaintiff in fact sold them for on the breaker egg market. The Average Total Cost is equivalent to the cost per dozen eggs of operating the three farms and producing the eggs during the regulation period. Defendant represented that the "But For" Revenue per dozen eggs was 57.62¢, the Actual Revenue per dozen eggs was 51.52¢, and the Average Total Cost was 54.96¢ per dozen eggs. Thus, under plaintiff's formulation, the diminution in profit was 229.3%. Defendant claims that by using Average Total Cost, plaintiff overstates the losses it suffered. Instead, defendant avers that the court should look only at the Incremental Costs, costs attributable directly to the production of the eggs, excluding expenses generally associated with the opera-

tion of the farms. Defendant, therefore, offered this formula instead:

$$\frac{\text{"But For" Revenue—Actual Revenue}}{\text{"But For" Revenue—Incremental Cost}^{[18]}}$$

Defendant maintains that the Incremental Cost of the eggs was 44.19¢, a number it arrived at by subtracting out the costs Rose Acre would have avoided if the three farms had ceased to produce eggs altogether during the regulation period. Defendant avers that this is the proper measure of costs because "[i]t's that parcel's contribution to costs and, therefore, that parcel's contribution to profit."[19] Defendant, therefore, claims that plaintiff only suffered a 45.4% diminution in return, which is not a severe enough economic impact to constitute a taking.

The Federal Circuit instructed this court to consider the severity of the economic impact of the regulations by considering the losses on all three farms as a whole. *Rose Acre III*, 373 F.3d at 1190. In fact, the Federal Circuit specifically noted that the use solely of incremental costs, as the government suggested during the original trial, the appeal, and the most recent trial, is inappropriate. *Id.* at 1189. The Federal Circuit specifically stated that determining plaintiff's profit by subtracting the incremental costs from the total revenue for all three farms "inaccurately prejudices the results." *Id.*

Moreover, defendant's method of determining the diminution in return simply does not reflect reality. In the real world, plaintiff chose to continue operating the farms using the only means available—selling the eggs on the breaker market, and even building a breaker facility on its premises. Defendant's calculations, however, are based on a hypothetical situation, what costs the plaintiff would have saved if it had shut all three farms down completely and Dr. Reiff's testi-

---

15. *Plaintiff's Exhibit (PX) 800, Table 30.*

16. The Federal Circuit ruled that this "court must consider only the actions of the federal government (and their effects) in evaluating Rose Acres' takings claims." *Rose Acre III*, 373 F.3d at 1196. Therefore, plaintiff reduced its claimed losses and profits by ten percent because at the time the regulations were enacted, it sold ten

percent of its eggs within the state of Indiana. *Id.* at 1195.

17. *Defendant's Exhibit (DX) 1037.*

18. *Id.*

19. *Tr. at 1872.*

mony regarding why using incremental costs was appropriate was simply not credible. If the court were to use defendant's method, it would essentially punish plaintiff for attempting to mitigate its damages. Although there is no specific duty to mitigate damages in a regulatory takings case like in contract law, the Federal Circuit implied in *Yancey* that the plaintiffs' attempt to alleviate the impact of the regulations by selling their flock for slaughter was an important factor in awarding compensation. *Yancey*, 915 F.2d at 1543 ("[The plaintiffs] properly mitigated their damages, by selling their flock when the poultry quarantine became overly burdensome. Nevertheless, the [plaintiffs'] business was wiped out through no fault of their own; just compensation is warranted in this case."). Therefore, because the Federal Circuit clearly indicated that this court should consider all three farms in their entirety and plaintiff took steps in the real world to find an economically viable way to continue its operations, there is no need to engage in defendant's hypothetical.

Using plaintiff's calculations, the diminution in return for the period of the regulations was 219.2%. It is clear, therefore, that plaintiff suffered a significant loss while the regulations were in effect. *See e.g. Cienega Gardens*, 331 F.3d at 1343 ("The loss of 96% of the possible rate of return on the investment is, even under the most conservative view, a 'serious financial loss.' "). The time period of the regulations, however, was "relatively brief," as the Federal Circuit noted. *Rose Acre III*, 373 F.3d at 1185. Although there is no bright line test of how long is long enough to effect a regulatory taking, the Federal Circuit has found a period of one year to be too short and a period of six years to be sufficiently long. *Compare Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1351–52 (Fed.Cir.2004) *with Cienega Gardens*, 331 F.3d at 1342–46. Obviously, the

case at bar falls somewhere in between. Dr. Just testified that a 219.2% loss of profits is "equivalent to losing 100 percent of profits over 3½ years. To me, that is a very substantial impact, and hard to imagine, how a business can survive, especially in—with thin profit margins as Rose Acre had." [20] This testimony was very credible and made it clear that the regulations restricted plaintiff's business long enough to have an extended and critical effect.[21] Therefore, because the regulations had a severe, albeit temporary, economic impact on plaintiff's business, the court finds that this factor weighs heavily in favor of the plaintiff.

### B. Reasonable Investment–Backed Expectations

This court found, and the Federal Circuit agreed, that the second factor, that the regulations interfered with plaintiff's investment-backed expectations, favors the plaintiff. *See Rose Acre III*, 373 F.3d at 1190–91; *Rose Acre II*, 55 Fed.Cl. at 658–59. Therefore, there is no need to further address this factor.

### C. Character of the Government's Action

The character factor requires the court to "consider the purpose and importance of the public interest reflected in the regulatory imposition." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176 (Fed.Cir. 1994). A regulation that burdens private property may "constitute a 'taking' if [the burden is] not reasonably necessary to the effectuation of a substantial public purpose." *Penn Central*, 438 U.S. at 127, 98 S.Ct. 2646. The fundamental purpose of the Takings Clause is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct.

20. *Tr. at 1744.*

21. Dr. Just also testified to additional consequential damages plaintiff claims resulted from the regulations. Defendant argues that because consequential damages are not compensable, they should not be considered in determining the economic effect of the regulations. Evidence of other losses is arguably relevant under FRE 401

(" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"), but because the court finds that the diminution in return alone demonstrates a severe economic impact, it need not consider the other losses.

1563, 4 L.Ed.2d 1554 (1960). The regulations at issue can be examined under the lens of state nuisance law. "If the regulation prevents what would or legally could have been a nuisance, then no taking occurred. The state merely acted to protect the public under its inherent police powers." *Creppel v. United States,* 41 F.3d 627, 631 (Fed.Cir. 1994).

The Federal Circuit found that this factor weighs in favor of defendant. Plaintiff, however, argues that a recent Supreme Court case, *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), affects the character inquiry to the extent that the Federal Circuit's analysis was improper. In *Lingle,* the Supreme Court stated that the " 'substantially advances' formula suggests a means-ends test: It asks, in essence, whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Lingle,* 544 U.S. at 542, 125 S.Ct. 2074 (emphasis in original). The Court went on to suggest that this is appropriate in due process cases, but not in takings cases because "[a] test that tells us nothing about the actual burden imposed on property rights, or how that burden is allocated, cannot tell us when justice might require that the burden be spread among taxpayers through the payment of compensation." *Id.* at 543, 125 S.Ct. 2074.

Although the Federal Circuit arguably used a means-ends test in determining that the character factor weighs in favor of defendant, *Lingle* does not necessarily invalidate the Federal Circuit's finding. In order to determine if *Lingle* affects the Federal Circuit's earlier determination, the court would limit its review to ascertaining whether *Rose Acre III* satisfies the legal analysis required by *Lingle.* *Hughes Aircraft Co. v. United States,* 140 F.3d 1470, 1474 (Fed.Cir.1998). Nonetheless, this court notes that its analysis of this factor after the 2002 trial was likely the correct approach under *Lingle.* This court, however, will not endeavor to resurrect its earlier conclusion that plaintiff "shared a disproportionate amount of the burden of the SE regulations," *Rose Acre II,* 55 Fed.Cl. at 660, because, under the "law of the case" doctrine, we must accept the Fed-

eral Circuit's finding. Moreover, there is little indication that a new examination of this factor, taking *Lingle* into consideration, would alter the Federal Circuit's conclusion that the character of the government's action favors defendant. Therefore, this factor weighs in favor of defendant.

### D. Balancing of the *Penn Central* Factors

The final step of the court's analysis is a weighing of the three *Penn Central* factors. As stated above, this court finds that the first two factors, severity of economic impact and reasonable investment-backed expectations, favor plaintiff while the final factor, character of the government's action, favors defendant. "When adverse economic impact and unanticipated deprivation of an investment backed interest are suffered ... compensation under the Fifth Amendment is appropriate. Even when pursuing the public good ... the Government does not operate in a vacuum. Bluntly stated, the consequences of the Government's action cannot be ignored." *Yancey,* 915 F.2d at 1542. On balance, plaintiff's severe economic loss and reasonable investment expectation outweigh government's attempt to prevent the spread of salmonella. Although government's interest in preventing the spread of disease is strong, the burden on plaintiff was so heavy that it is only equitable that the public should shoulder a portion of the weight. "If the intent of the [regulations] was to benefit the public, the public should be responsible for the [plaintiff's] losses." *Id.* Just as the *Yancey* court found, this court holds that, despite government's attempt to ensure the public's health and safety, a compensable taking occurred and plaintiff deserves just compensation.

### E. Just Compensation and Interest

Plaintiff claims it is entitled to $6,638,446.11, based on Dr. Just's calculation, plus interest computed from the date of the taking to the date of payment. Although Dr. Just's calculations are credible and correct [nor were they disputed by the government], this court will reduce the amount, as it did after the 2002 trial, by $1,226,426.04, which plaintiff received as revenue from the sale of breeder eggs and started pullets. *Rose Acre*

*II*, 55 Fed.Cl. at 665. Plaintiff is, therefore, entitled to $5,412,020.07 plus interest.

During opening statements, plaintiff alleged that compound interest is justified in this case, but abandoned this argument in its post trial briefs. Therefore, for the reasons stated in this court's previous decision, plaintiff is entitled to simple interest, calculated using the 52–week treasury bill rate. *Id.* at 665–66. Said simple interest began to accumulate on October 5, 1990, which was the date plaintiff's healthy eggs were first restricted.

### Conclusion

For the above-stated reasons, the Clerk is directed to enter judgment in favor of plaintiff in the amount of $5,412,020.07, plus simple interest at the 52–week treasury rate commencing from October 5, 1990. The court will determine the appropriateness and amount of attorney fees at a later date.

IT IS SO ORDERED.